[S. F. No. 15604. In Bank.—July 1, 1936.]

COUNTY OF SAN DIEGO (a Political Subdivision), Petitioner, v. CHAUNCEY R. HAMMOND, as County Auditor and Controller, Respondent.

Thomas Whelan, District Attorney, and James B. Abbey, Special Deputy District Attorney, for Petitioner.

U. T. Clotfelter and L. W. Butterfield, as *Amici Curiae* on Behalf of Petitioner.

Albert J. Lee and Stearns, Luce, Forward & Swing for Respondent.

W. S. Staley, as *Amicus Curiae* on Behalf of Respondent.

CURTIS, J.—Petition for a writ of mandate directed to the respondent, as Auditor and Controller of the County of San Diego, requiring him to attest certain bonds and to sign the coupons issued by the board of supervisors of said county under and in pursuance of an act of the legislature of this state entitled, ''An Act for the relief of certain assessment districts, and for that purpose empowering counties to render financial aid to such districts and making available to such districts the provisions of Chapter 9 of the act of Congress entitled 'An Act to establish a uniform system of bankruptcy throughout the United States,' approved July 1, 1898, as amended, and to declare the urgency of this act, to take effect immediately.'' (Stats. 1935, chap. 10, p. 63.)

Section 1 of the act provides that where bonds have heretofore been issued under the provisions of the Road Improvement District Act of 1907, and amendments thereof, or the Acquisition and Improvement Act of 1925, and amendments thereof, for the payment of the cost of any public improvement made, things done, rights acquired, or proceedings taken, within the territorial limits of any county, or any incorporated city thereof, the board of supervisors of such county

shall have the right and power to purchase or redeem, at a discount, such bonds and any interest coupons issued with such bonds, where the public improvements made, things done, rights acquired, or proceedings taken, are of general county interest, use or benefit, or where the general county interest will be served and such county materially benefited by the purchase of such bonds or interest coupons. The purchase of bonds or coupons herein authorized may be carried out upon such terms and in such manner as the board of supervisors may deem most convenient, subject only to the restrictions contained in said act.

Section 2 of said act provides that in all cases where the purchase or redemption of said bonds and coupons is authorized, the board of supervisors shall also have the right and power to contribute or transfer at any time such amount of money to the interest and sinking fund of such district or districts as in the judgment of said board of supervisors should be transferred to accomplish the objects and purposes of said act, provided that the amount so contributed or transferred for any district shall not exceed fifty per cent of the total face value of the outstanding bonds of such district.

Section 3 of said act provides that the moneys provided to be expended for the purchase or redemption of such bonds or interest coupons, or to be transferred or contributed to the sinking fund of any such district or districts, may be paid out of the general fund of such county, or any fund available, or that may be made available for that purpose under any law of this state, or from any fund that may hereafter be specially provided. Boards of supervisors are authorized to raise and provide by general taxation such moneys as in their opinion may be necessary to carry out the purpose of said act, subject to the provisions of section 20 of article XI of the Constitution of this state. Bonds of such county may be issued and sold under the provisions of section 4088 of the Political Code or any law of this state now or hereafter existing governing the issuance and sale of general county obligations, for the purpose of providing funds to purchase or redeem such bonds and coupons or make the contributions or transfers provided in said act to be made, and for any other purpose for which funds may be expended under said act.

By section 4 of said act it is required, before any moneys may be paid out in aid of any district by such board of supervisors for any of the purposes specified in said act, that said board of supervisors shall by resolution duly adopted by a four-fifths vote declare that public convenience and necessity demands and that the general county interest will be served and promoted by the expenditure of such county moneys, and every such resolution shall specify in detail the maximum amount to be expended or contributed for such district, the manner in which the same is to be used and a concise statement of the facts and circumstances showing the manner in which and the reason why the general county interest and welfare will be served and promoted by the expenditure to be made.

Section 5 of said act provides for the disposal of bonds and coupons purchased or redeemed by the county under the provisions of said act. Upon such purchase or redemption, the bonds and coupons become the property of the county and may be presented for payment in the same manner as though owned by a natural person. The board of supervisors may if it deems it advisable in its sole discretion publicly cancel and destroy all or any portion of the bonds and coupons so purchased or redeemed. The board of supervisors may retain all or any portion of said bonds and coupons as provided in this section, and in connection with such bonds or coupons so retained, may by ordinance forever waive any right or rights accruing to the county by reason of the ownership of said bonds or coupons. The board of supervisors may also reduce the rate of interest upon bonds retained, or may reduce the face value of any bonds or coupons so retained, or may forever waive the right of the county as owner of such bonds or coupons to require an annual levy upon the lands within said district to pay principal or interest on bonds due or past due at the date of the annual tax levy in such district. In case any waiver provided in this section is made by the board of supervisors, an appropriate notation to that effect must be stamped upon or across the face of the bond affected by such waiver.

It is provided in section 6 of the act that, ''In the event that bonds or coupons so purchased or redeemed are canceled, discharged or destroyed by such board of supervisors, said board of supervisors shall have the right to order canceled

from the tax records of such county, by appropriate resolution, all or any portion of the uncollected assessments or special assessment taxes, interest, penalties, or costs appertaining thereto, which have been levied for the payment of the bonds or coupons so canceled; provided, however, that any cancellations made as provided in this paragraph, in any district shall be made in such manner as to reduce the burden uniformly and proportionately upon all of the lands in such district.''

Section 7 and section 8 are not material to any issue raised by either party to this proceeding.

We quote section 9 and section 10 in full. They are as follows:

''Section 9. The purpose of this act is to provide a complete scheme whereby any financially distressed and delinquent or insolvent district or districts created under the provisions of the Acquisition and Improvement Act of 1925 and amendments thereof, or the Road District Improvement Act of 1907 and amendments thereof may be refunded or the bonded indebtedness thereof adjusted with the financial aid of the county in which the same may be situated and without the necessity or expense of destroying the structure or operation of such district, and without issuing refunding bonds or reassessing the same under any assessment refunding statute. Boards of supervisors are hereby vested with power and jurisdiction to do all and singular the things authorized by this act and to do such additional and incidental things as may be necessary and proper to give county financial aid in keeping with the purpose expressed in this section where such things and additional and incidental things as may be necessary and proper to give county financial aid in keeping with the purpose expressed in this section may be done without invading the vested rights of any property owner or bond holder of such district or districts. In addition to the expenditures expressly authorized in this act, boards of supervisors are empowered to provide from the sources hereinbefore mentioned for all necessary incidental, legal and other expenses incurred in carrying out the provisions of this act.

''Section 10. This act is hereby declared to be an urgency measure necessary for the immediate preservation of the public peace, health and safety within the meaning of section 1

of article IV of the Constitution, and shall therefore go into immediate effect.

"The facts constituting the necessity are as follows:

"During the fifteen years last past hundreds of districts have been organized throughout the State of California under the provisions of the Road District Improvement Act of 1907, and the Acquisition and Improvement Act of 1925. Many of these districts were created during times of great economic prosperity and high land values. In many of such districts, due to the optimism of the times, or other causes, bonds for public improvements were issued in amounts in excess of the ability of the lands of such districts to bear the assessments necessary to pay the principal and interest on such bonds. Millions of dollars in assessed land valuation are located within districts created under these acts. Due to the present economic depression land values throughout the State have shrunk to the point where, in many cases, the total assessed valuation of all lands within a given district is less than the face value of the bonds outstanding in such district. Annual assessments upon individual parcels of land within these districts amount in many instances to more than the assessed value of such land.

"Under present economic conditions property owners are unable to meet these high assessments and hundreds of such districts throughout the State have reached a point of hopeless delinquency.

"Inasmuch as the property owners of these districts cannot, under the law, pay their county or municipal taxes without at the same time paying the district assessments many cities and counties are unable to collect large sums of money badly needed for the purposes of government.

"Many hundreds of properties in these districts are being deeded to the State for delinquent taxes and assessments and unless the financial aid of the counties is immediately made available to assist these overburdened districts thousands of property owners will lose their homes, millions of dollars in governmental revenue will be uncollectible and at the same time thousands of bondholders will be unable to realize any return upon their investments."

Acting under the provisions of said act, the board of supervisors of the County of San Diego by resolution adopted by a four-fifths vote of its members, found, determined,

and declared that the public interest, convenience, and necessity demanded, and the general county interest would be served and promoted, and the said County of San Diego materially benefited by the refunding and adjustment of the outstanding indebtedness of certain improvement districts therein specifically described which had been theretofore organized and were then existing under the provisions of either the Road District Act of 1907 or the Acquisition and Improvement Act of 1925, and that the cost thereof would be $2,600,000. On the 23d day of September, 1935, the board of supervisors of said County of San Diego adopted a resolution or order calling a special election throughout the County of San Diego for the purpose of submitting to the qualified voters of said county a proposition for the incurring of a bonded indebtedness in the sum of $2,600,000, the proceeds thereof to be used for the purpose of refunding and adjusting the outstanding bonded indebtedness of special assessment districts within the County of San Diego and the incorporated cities therein where such districts have been organized under the Road District Improvement Act of 1907 or the Acquisition and Improvement Act of 1925. In pursuance of said resolution, a special election was held throughout said County of San Diego, at which election there was submitted to the voters of said county said proposition for the incurring of said indebtedness the proceeds to be used for the purposes set forth in said resolution. No question is raised as to the regularity or validity of the proceedings under which said election was called and held, and the vote of the electors cast at said election canvassed and determined, or that said proceedings did not in any respect meet the requirements of section 4088 of the Political Code, except those objections hereinafter referred to. At said election more than two-thirds of the electors of said county, voting at such election, voted in favor of the issuing of said bonds. The board of supervisors thereupon proceeded to and did issue said bonds except for the signature of the respondent, and requested respondent to attest the same and sign the coupons attached thereto. The respondent has refused to comply with said request or to attest said bonds, or any of them, or to sign said coupons or any of them.

It is to compel said respondent to attest said bonds and to sign said coupons that this proceeding was instituted. To

the petition herein the respondent has demurred generally and has also filed an answer. The petitioner has filed a general demurrer to the answer. The pleadings in our opinion do not raise any disputed question of fact material to the issues involved herein. It will not be necessary, therefore, to take any evidence, either by a reference or otherwise, in order to determine the legal questions arising in this controversy.

While some minor objections are raised by respondent as to the procedure followed by the board of supervisors in the issuance of said bonds which will be discussed later in this opinion, the principal point assigned by respondent for his refusal to sign and attest said bonds and coupons is that chapter 10 of the Statutes of 1935 is unconstitutional in several respects which we will now proceed to discuss.

In determining the validity of said act we must give consideration to the rights of the holders of the bonds which are sought to be refunded under its provisions, the rights of the landowners in the respective districts involved, and the power and authority of the county to expend its funds for the purposes designated in said act.

It is the settled law of this state that bonds issued under improvement acts of this state constitute a contract between the landowners, on one hand, and the bondholders on the other, and that any attempt by legislation or otherwise to impair such contract will be declared ineffective and invalid when tested in a judicial proceeding. (*County of Los Angeles* v. *Rockhold*, 3 Cal. (2d) 192 [44 Pac. (2d) 340, 100 A. L. R. 149]; *County of San Diego* v. *Childs*, 217 Cal. 109 [17 Pac. (2d) 734]; *Jeffreys* v. *Point Richmond Canal & Land Co.*, 202 Cal. 290 [260 Pac. 548]; *Palo Verde Irr. Dist.* v. *Seeley*, 198 Cal. 477 [245 Pac. 1092]; *La Mesa etc. Irr. Dist* v. *Halley*, 197 Cal. 50 [239 Pac. 719]; *Peery* v. *City of Los Angeles*, 187 Cal. 753 [203 Pac. 992, 19 A. L. R. 1044]; *Chapman* v. *Jocelyn*, 182 Cal. 294 [187 Pac. 962].) Therefore if the act in question or the proceedings taken by the board of supervisors of San Diego County impair either the rights of the bondholders or the landowners in said improvement districts, the validity of said refunding bonds cannot be sustained.

We will first consider the rights of the bondholders as affected by the terms of said act. It will be noted from

a reading of the act that in so far as the bondholders are concerned the terms of the act are only permissive as to them. They are not required to surrender their bonds and accept the refunding bonds and the cash payment on the part of the county. The act leaves it entirely optional with each bondholder whether he will retain his old bonds or whether he will avail himself of the rights accorded to him under the refunding proceedings. As the bondholders' rights are in no way affected by the terms of the act, the contract evidenced by the bonds held by him is not, of course, impaired to any extent. In so far as the bondholders are concerned, the act does no violence to their rights, and its validity in respect to the bondholder cannot be questioned.

In considering the terms of the act in so far as they affect the rights of the property owners whose property is liable for the payment of the improvement bonds, it is apparent that their liability in that respect is not in any manner changed, except that after the county has acquired the improvement bonds, it may in the manner provided in the act waive in part or entirely its right to enforce this liability against said property owners. These property owners, of course, are not prejudiced by any reduction of their obligations which the county may under the terms of the act determine to grant. On the other hand, they receive a distinct and material benefit by having their obligations reduced. Respondent further contends, however, that the landowner who has paid all assessments levied against his land in payment of the outstanding bonds of the district, is further subjected to the payment of an additional tax to meet the payment of the refunding bonds issued in pursuance of the proceedings now under attack, and that by subjecting him to this additional tax the contract of the landowner arising under the original improvement proceedings has been impaired. In other words, respondent contends that the landowner agreed to pay for the improvements, only the assessments levied against his land for the purpose of paying the original bonds and that any requirement that he make any additional payment casts upon him an additional burden and to that extent impairs his contract under which his property was improved. The sole authority cited by respondent in support of this contention is the case of *Oregon Short Line R. Co.* v. *Berg*, 52 Idaho, 499 [16 Pac. (2d) 373].

The opinion in that case was by a divided court, two out of the five justices of the court dissenting in a most vigorous and well-considered opinion. The rule announced by the majority opinion in that case has never been approved in this state. It appears out of harmony with the principle announced by this court in the case of *People* v. *Sacramento Drainage Dist.*, 155 Cal. 373, 389 [103 Pac. 207], where the court draws a distinction between special assessments levied for the purpose of paying for improvements which directly benefit the land, and general taxes levied for ordinary purposes. The former only are levied in payment of the improvement, while the latter are levied for general public purposes. In the present instance, by virtue of his ownership of the land within the district, the landowner pays the assessment levied for the purpose of paying for the improvement of his land and with other landowners of the county he will be called upon to pay a tax to meet the refunding bonds as they become due. If the latter tax can be sustained as a legal tax against the landowners generally within the county, it is valid against the landowners within the several districts of the county. This brings us to the consideration of the power and authority of the county to expend the funds, which are raised by a sale of said refunding bonds for the purpose of paying a portion of the delinquent assessments against the real property within said districts. The main contention of the respondent against the validity of said act which purports to authorize the expenditure of county funds for the purpose of relieving the lands within said districts from said delinquent assessments is that such a payment would amount to a gift of public money to private individuals in contravention of section 31 of article IV of the Constitution of this state.

This section provides in part: ''The legislature shall have no power . . . to authorize the giving or lending of the credit of . . . any county . . . in aid of or to any person, association or corporation . . . or to pledge the credit thereof in any manner whatever, for the payment of the liabilities of any individual, association . . . whatever; nor shall it have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation . . . ''

█ Before discussing respondent's cases, some brief mention should be made of the interpretation of the above section. It is well settled that in determining whether any appropriation of public funds is to be deemed a gift, ''the primary and fundamental subject of inquiry is as to whether the money is to be used for a public or private purpose. If it is for a public purpose . . . it is not, generally speaking to be regarded as a gift.'' (*City of Oakland* v. *Garrison*, 194 Cal. 298, 302 [228 Pac. 433].) That case is an interesting one and distinguishes the case of *Conlin* v. *Board of Supervisors*, 99 Cal. 17 [33 Pac. 753, 37 Am. St. Rep. 17, 21 L. R. A. 474], and Id., 114 Cal. 404 [46 Pac. 279, 33 L. R. A. 752]. The state legislature authorized counties to appropriate money to incorporated municipalities when the board of supervisors determined that the construction or improvement of a street was of general county interest. The sole contention was that this was a gift of county funds to a municipal corporation in direct violation of the express language of the quoted constitutional provision. This court unanimously held that it was not. The case is not analogous to our present case because in the Garrison case the county funds were to be advanced *before* the construction of the improvement, but it is important because of its interpretation of the constitutional provision. The case reviews many authorities and holds that the opening and extension of streets is a matter of public and not private concern, and further that opening of streets in a city was a matter of *general county concern*. The court relies strongly on the resolution of the board of supervisors so declaring. It is of some interest that in reaching this result this court relied on and cited *Reclamation Board* v. *Chambers*, 46 Cal. App. 476 [189 Pac. 479], the case relied on and cited in the case of *County of Los Angeles* v. *Rockhold*, 3 Cal. (2d) 192 [44 Pac. (2d) 340, 100 A. L. R. 149], on this point.

The Garrison case limits our inquiry to the determination of the question as to whether the issuance of the bonds, as provided in the 1935 act, is for a *public* purpose. One other principle applicable to the construction of article IV, section 31, should be mentioned. In *Veterans' Welfare Board* v. *Jordan*, 189 Cal. 124 [208 Pac. 284, 22 A. L. R. 1515], there is an exhaustive discussion of what constitutes a public purpose within the meaning of the above constitutional provision.

The act there under consideration authorized a $10,000,000 bond issue to raise money to assist war veterans in acquiring homes. This court in that case held that the act was constitutional because it tended to carry out a state policy of land settlement and that it was immaterial that in carrying out this main public purpose, individuals incidentally benefited. At page 141, the court said, "Where a separate and distinct public purpose is achieved and such public purpose is one within the constitutional powers of the legislature to bring about, we do not feel that we would be justified in declaring that the law is unconstitutional, because of the fact that as an incident of its main purpose the credit of the state is used to effectuate that purpose." It was held that a public purpose embodies not only expenditures which are necessary for the continued existence of government, but also those "which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity to the people".

Keeping the above principles in mind, let us turn to the cases cited by respondent:

*McBean* v. *San Bernardino,* 96 Cal. 183 [131 Pac. 49]. In this case a sewer was constructed under a special assessment act which, by its terms, expressly provided that the city should not be liable for any portion of the expense. After the improvement was completed, the city attempted to assume a portion of the liability. Clearly this is a case of attempting to pay a debt to a private individual without benefit of any kind to the city.

*Conlin* v. *Board of Supervisors,* 99 Cal. 17 [33 Pac. 753, 37 Am. St. Rep. 17, 21 L. R. A. 474]. This case involved a state statute authorizing the board of supervisors of San Francisco to pay to Conlin about $54,000, the balance due him for street work, which balance could not be collected by him because of an irregularity in the street proceedings. A clearer case of an act for a private purpose cannot be imagined.

*Molineux* v. *State of California,* 109 Cal. 378 [42 Pac. 34, 50 Am. St. Rep. 49]. Here again we are presented with an act private in character. It was held that the legislature could not retrospectively pass a law conferring a right on the holder of bonds to interest after maturity when, at the

time the bonds were issued, no such liability existed. Obviously, no public purpose was involved nor even urged.

*Conlin* v. *Board of Supervisors,* 114 Cal. 404 [46 Pac. 279, 33 L. R. A. 752]. This is the second Conlin case. The first one, *supra,* involved an act of the 1891 legislature directing San Francisco to pay Conlin. This case involved an 1895 act to the same effect, but broader in its terms. The court held that the act was not only an attempt to make a gift of public funds for a private purpose, but also special and local in character.

*Meyer* v. *San Francisco,* 150 Cal. 131 [88 Pac. 722, 10 L. R. A. (N. S.) 110]. The pertinency of this case does not appear. The action was by a bondholder to recover from the city and county certain bonds which, on their face, were payable by a special assessment district. The court held that there never was any liability on the part of the city and county, but that the bonds were payable out of a special fund. The case is not in point.

*Union Trust Co.* v. *State of California,* 154 Cal. 716 [99 Pac. 183, 24 L. R. A. (N. S.) 1111]. Here the state legislature by special act provided for the opening of Montgomery Avenue in San Francisco, and provided a special procedure therefor, including the creating of a special assessment district to pay the cost thereof. Purporting to act pursuant to this statute, bonds were issued, payable by this special district, and the improvement was constructed in 1874. In *Mulligan* v. *Smith,* 59 Cal. 206, it had been held that the procedure required by the act had not been followed and that, therefore, all assessments levied on the district owners were void. As a result, no interest or principal payments were made. In 1893, the state agreed to be sued on contract or negligence claims. The case of *Union Trust Co.* v. *State of California, supra,* was instituted by a holder of $855,000 of the bonds for that sum, plus over $1,100,000 interest, under that statute. The theory was that the state, having authorized the issuance of the bonds, in effect contracted that its agents would properly perform and, they not having done so, the state was liable. This theory is, of course, untenable, and it was so held. The case is not in point.

It is obvious that the above cases all deal with an attempt to levy a tax for private purposes. In the Rockhold case (3 Cal. (2d) 192), it was held, by way of *dicta,* that a con-

tribution by the county for the purpose of assuming a portion of the cost of the complete improvement is not violative of the constitutional provision, citing *Reclamation Board* v. *Chambers,* 46 Cal. App. 476 [189 Pac. 479]; *Sacramento & San Joaquin Drainage Dist.* v. *Riley,* 199 Cal. 668 [251 Pac. 207]; *Reclamation Board* v. *Riley,* 208 Cal. 661 [284 Pac. 668]; and also stating that the county could have assumed part or all of the burden *before* the improvement was completed and, therefore, may now assume the same. This reasoning appears to be at variance with the conclusion reached by this court in the cases cited by respondent and analyzed above. It is unfortunate that these cases were not called to our attention at the time the Rockhold case was before us. Had they been called to our attention, we would undoubtedly have discussed them in the opinion in that case. What we had to say in the Rockhold case respecting the right of the county to contribute toward the payment of outstanding indebtedness of said delinquent districts was not necessary to the decision as finally rendered in that case, and may not therefore now be relied upon as authority in the present proceeding.

However, in our opinion, there is a complete and conclusive answer to respondent's contention that the 1935 Act violates said section of the Constitution. No appropriation of a county is a gift, if it is made for a county and for a public purpose, under the cases above cited. (*City of Oakland* v. *Garrison, supra,* and *Veterans' Welfare Board* v. *Jordan, supra.*) Moreover, in the Veterans' Welfare Board case, *supra,* it was held that an outright appropriation of ten million dollars to veterans to buy homes would be unconstitutional, but the appropriation of money to veterans to buy homes as part of a resettlement project was constitutional, because resettlement was a public purpose, and the mere fact that certain individuals of a class—veterans—benefited thereby was immaterial. The analogy to the present case is obvious. The act empowers the counties to render financial aid to certain assessment districts. (Stats. 1935, chap. 10, p. 63.) Section 10 of the act recites the reasons for its passage. Among other things, it recites that, "Under present economic conditions property owners are unable to meet these high assessments and hundreds of such districts throughout the state have reached a point of hopeless delinquency. Inasmuch as property owners of these districts cannot, under

the law, pay their county or municipal taxes without at the
same time paying the district assessments, many cities and
counties are unable to collect large sums of money badly
needed for the purposes of government. Many hundreds
of properties in these districts are being deeded to the state
for delinquent taxes and assessments and, unless the financial
aid of the counties is immediately made available to assist
these overburdened districts, thousands of parcels of land
will be stricken from the tax rolls this year; thousands of
property owners will lose their homes, millions of dollars
in governmental revenue will be uncollectible . . . '' The
allegations of the petition demonstrate the necessity for the
legislation, alleging as it does that in one assessment district
an owner of one lot assessed at $100 was presented with an
assessment bill for $43,816.98 for the year 1935 alone. The
1935 statute is permissive only. Following its passage, the
board of supervisors of San Diego made a ''complete finan-
cial survey'' of the conditions existing within its borders
and, as a result of the survey, determined that ''there exist
within the County of San Diego fifty-six Special Assessment
Districts in an advanced state of delinquency and default''.
The resolution duly passed states: ''Be it further resolved,
found and declared: . . . That the public improvements
made . . . for the payment of which said District bonds were
issued are of general county interest, use and benefit . . . that
the general county interest will be served and said county
materially benefited by the purchase or redemption of the
oustanding bonds . . . and that the general county interest
will be served and promoted by the expenditure of county
funds for the refunding and adjustment of the outstanding
bonded indebtedness of said Districts . . . '' The resolution
of the board further recites that the lands lying within
the fifty-six districts comprise in excess of one-tenth of the
taxable property of the County of San Diego; that due to the
pyramiding of assessments the property owners within these
fifty-six districts ''have, for the past year, virtually ceased
paying taxes or assessments upon their properties''; that
property owners cannot pay the assessments; that thousands
of properties within the district have been or are about to
be deeded to the state for delinquent taxes and assessments;
that unless financial aid is extended thousands of parcels
of land will be stricken from the tax rolls and ''over two

million dollars in county taxes now delinquent will be rendered uncollectible''; that the properties within the districts have no market value, due to the assessment problem; that by refunding and adjusting the bonded indebtedness with county funds the county could induce payment of delinquent taxes in excess of two million dollars, thereby restoring millions of dollars in taxable property to the tax rolls, and could prevent millions of dollars of loss of future revenue.

Under such circumstances can it be doubted that the main purpose of the appropriation is public in nature? Can we, in view of the *facts* alleged, and in view of the judicial knowledge we have, and in view of the declaration of necessity by both the state legislature and the board of supervisors, say that a public purpose is not served by restoring to the tax rolls one-tenth of the property of a county, thus relieving all taxpayers in the county? The declaration of the legislature and the board of supervisors, while perhaps not conclusive, is entitled to considerable weight. (*City of Oakland* v. *Garrison,* 194 Cal. 298 [228 Pac. 433].) The mere fact that bondholders and property owners benefit from the scheme does not, under the *Veterans' Welfare Board case,* 189 Cal. 124 [208 Pac. 284, 22 A. L. R. 1515], render the appropriation invalid. This argument seems so conclusive that there is no reason to determine whether under both improvement acts, in pursuance of which the improvement bonds were issued, the county, even after said bonds were issued, could not have assumed the very liability here sought to be assumed. The following additional cases, in our opinion, support the views expressed above: *Argyle Dredging Co.* v. *Chambers,* 40 Cal. App. 332 [181 Pac. 84], in which the District Court of Appeal relied heavily on the declaration of necessity found in the legislative enactment in determining that the purpose of the appropriation was public and not private; *City of Sacramento* v. *Adams,* 171 Cal. 458 [153 Pac. 908], where the city appropriated $700,000 for the purpose of purchasing certain specific lands to be absolutely donated to the state, on the sole condition that the state expend $3,000,000 in constructing thereon state buildings. It was contended that this constituted a gift of public funds, but it was held that the construction of the state buildings pertained to the progress, advantage and interests, of the city and to the convenience and advantage of its inhabitants,

—in other words, it was a public purpose; *City of Pasadena* v. *Chamberlain*, 1 Cal. App. (2d) 125 [36 Pac. (2d) 387], in which it was held that a city could appropriate money to pay back taxes and an assessment under the Acquisition and Improvement Act of 1925 on property to be acquired for park purposes, even though it could, upon application, have been relieved of the necessity of paying back taxes, and where it was further held that "the fact that incidental thereto a private benefit may result is no sufficient obstacle".

Our conclusion upon the question under discussion is that the Act of 1935 (Stats. of 1935, chap. 10, p. 63) is not subject to the constitutional objection that it authorizes the gift of public money to an individual or to any private purpose. The express purpose of the act is to restore to the tax rolls of the county the large amount of property within said delinquent assessment districts, which now, due to said excessive assessments, have been sold to the state and are contributing absolutely nothing to the support of the county government. This purpose is one within the constitutional powers of the legislature to accomplish, and it is not rendered futile by the fact that in carrying it out certain individuals incidentally are benefited thereby. (*Veterans' Welfare Board* v. *Jordan, supra.*) As the statute impairs neither the rights of the bondholders nor those of the property owners and as its provisions do not contravene any constitutional inhibition, it must be sustained as a valid and legal legislative act.

Respondent further contends that the refunding bonds are invalid because the purposes stated in the notice of election and in the ballot are not authorized by the statute and do not comply with section 4088 of the Political Code. Neither of these objections is meritorious. It is contended that the purposes stated in the notice of election are broader and more extensive than those stated in the act. But by reading section 5 and section 9 together, we find that all of the purposes stated in the notice of election are included and provided for in these two sections of the act. The objection that the purposes as stated in the notice of election do not comply with the provisions of section 4088 of the Political Code is completely answered by the construction of said section of the code by this court in the case of *Clark* v. *City of Los Angeles*, 160 Cal. 317 [116 Pac. 966].

■ A further contention is made that the findings of the board of supervisors calling said election are insufficient. It would serve no useful purpose to consider in detail the extended and technical argument of respondent in support of this contention. As illustrating the general tenor of respondent's argument upon this question, we cite one instance in which he contends that a certain statement required by the act to be made in the resolution calling the election is contained in a recital of the resolution and not in the main body of the resolution. Others are of like character. We would hesitate to set aside the action of the board of supervisors, approved by an overwhelming vote of the electors of the county, in a matter of such vital importance to the county as the undertaking involved here appears to be, upon such unsubstantial and shallow grounds as those advanced by the respondent. At most, the errors in the proceedings complained of were mere irregularities, and could not affect or prejudice the rights of anyone. In our opinion, the resolution of the board of supervisors calling the election was legally sufficient.

■ Respondents further complain that the improvements for which bonds were issued in some instances included water mains or sanitary sewers, or both, and that the county could not in the first instance have levied a tax for such purposes. It will be noted, however, that we have not based our conclusion that the county may contribute toward the payment of said original bonded indebtedness upon the ground that the county could in the first instance have paid a part of the cost of said improvement, but upon the ground that the purpose of the payment of a portion of said indebtedness is to relieve the property in said delinquent districts of the heavy burden of taxes existing against it in order that the property may be restored to the tax rolls of the county and thereby and thereafter bear its proportionate share of the expense of maintaining said county. For this reason it matters not what the improvements may have been for the payment of which the original bonds were issued. If the property of the delinquent districts is placed upon a tax-paying basis, the nature of the improvement for which these delinquent taxes were assessed is a matter of no legal consequence.

■ The last contention of respondent which we consider necessary to discuss is that a portion of the property

within said delinquent assessment districts is situated within irrigation districts, or that this property has been sold for delinquent taxes and the title thereto is in the state of California. Consequently, the respondent contends, the carrying into effect of said refunding plan would not result in restoring the lands thus owned by the state to the tax rolls of the county. This situation presents a problem to the board of supervisors to work out in connection with the owners of the property and the irrigation districts. We cannot say as a matter of fact or as a matter of law that the board of supervisors may not in some legal and equitable manner secure the restoration of said lands within irrigation districts to the tax rolls of the county through the refunding proceedings now pending before the board.

None of the objections advanced by respondents against the validity and legality of said refunding proceedings are, in our opinion, well taken. The act impairs neither the rights of the bondholders nor the rights of the property owners under the contract which resulted from the original issue and sale of the bonds. Its provisions contravene no section of our Constitution to which our attention has been called, and the proceedings of the board of supervisors in pursuance of the terms of the act, in so far as they are set forth in the record before us, appear regular and legal. It, therefore, was the duty of the respondent as the auditor of said county, to attest said bonds and sign the coupons attached thereto.

Let the writ issue as prayed for.

Shenk, J., Langdon, J., Thompson, J., Waste, C. J., and Seawell, J., concurred.