[L. A. No. 19213. In Bank. Feb. 23, 1945.]

CITY OF LOS ANGELES, Petitioner, v. POST WAR PUBLIC WORKS REVIEW BOARD et al., Respondents.

[L. A. No. 19224. In Bank. Feb. 23, 1945.]

COUNTY OF LOS ANGELES, Petitioner, v. POST WAR PUBLIC WORKS REVIEW BOARD et al., Respondents.

[S. F. No. 17128. In Bank. Feb. 23, 1945.]

CITY OF OAKLAND, Petitioner, v. POST WAR PUBLIC WORKS REVIEW BOARD et al., Respondents.

J. H. O'Connor, County Counsel (Los Angeles), Harold W. Kennedy, Assistant County Counsel, Ray L. Chesebro, City Attorney (Los Angeles), William H. Neal and Bourke Jones, Assistants City Attorney, Roger Arnebergh, Deputy City Attorney, F. B. Fernhoff, City Attorney (Oakland), Archer Bowden, Deputy City Attorney, Ralph E. Hoyt, District Attorney (Alameda), and R. Robert Hunter, Assistant District Attorney, for Petitioners.

Robert W. Kenny, Attorney General, Charles W. Johnson, Supervising Deputy Attorney General, and Robert E. Reed, Deputy Attorney General, for Respondents.

SHENK, J.—The city of Los Angeles, the county of Los

Angeles and the city of Oakland filed separate petitions for the writ of mandate to compel the respondent Post War Public Works Review Board to perform its duties pursuant to chapter 47, Statutes of 1944, Fourth Extraordinary Session, approved June 20, 1944. They are deemed to be companion proceedings and are submitted on the petitions, the demurrers thereto, and the briefs of the parties.

The petitions present the question of the constitutionality of said act which is entitled: "AN ACT MAKING AN APPROPRIATION FOR ALLOCATION TO CITIES, COUNTIES, AND CITIES AND COUNTIES TO DEVELOP A POSTWAR PUBLIC WORKS PROGRAM COMPRISING THE PREPARATION OF SURVEYS AND PLANS AND SPECIFICATIONS FOR PROPOSED PUBLIC WORKS AND THE ACQUISITION OF RIGHTS-OF-WAY AND SITES FOR MAJOR STREETS, ROADS, BRIDGES, SEWERAGE AND OTHER PUBLIC FACILITIES, AND PROVIDING THE PROCEDURE FOR MAKING SUCH ALLOCATIONS."

The legislative purpose and declaration contained in section 1 reads as follows: "The termination of the present war will inevitably create serious economic problems for the people of this State.

"The change from a war economy to a peacetime economy and the tremendous and sudden increase in population in this State necessitate a corresponding increase in public works and facilities which is so widespread that it is a matter of State interest, necessary for the state-wide protection of the public health, safety and public welfare.

"The prevention of unemployment and the relief of hardship and destitution due to and caused by postwar unemployment is [sic] a joint obligation and duty of the Nation and the State within the limits of their resources. Postwar unemployment and its attendant misfortunes can be partially averted and alleviated by making adequate plans and preparation for an extensive program of public works to be constructed and engaged in during the period of postwar adjustment and until such time as private industry and commerce can provide employment for the men and women who will be discharged from the armed forces or who will be released from their present employment upon the termination of wartime activities. The experience of this State during the depression years of unemployment and its attendant hardships points to the necessity for a public works employment program. Failure to make provision for an adequate public works program in time to

meet the economic problems which will rise upon termination of the war will require the State to expend large sums to provide direct relief to persons who might otherwise be usefully employed in constructing necessary public works. Funds appropriated under this act by the State together with funds provided by local agencies to assist the State in carrying out the purposes of this act will enable the local agencies to engage in a large construction program which will provide employment for those military personnel discharged from the armed forces and those whose present employment will be terminated by the cessation of war production.

"A substantial program of postwar public works for the above purposes can be formulated only if such a program is planned now and carried out jointly by the State and by the counties and cities of the State, making provision in such a program for Federal participation at such time as the National Government may declare such a policy.

"The Legislature hereby declares that the granting of financial assistance in the preparation of plans and the acquisition of sites by the counties, cities and counties and cities, as provided in this act, is for State purposes because of the state-wide need for increase in public works and facilities and also as a part of and incidental to the averting of a serious postwar economic crisis and in furtherance of its plans to provide employment for some part of its citizens during the period of economic readjustment that will result upon the termination of the war or the substantial diminishing of war production in this State.''

Section 5(a) creates the Post War Public Works Review Board, consisting of the Director of Finance as chairman, the Director of Public Works, the Director of Reconstruction and Reemployment, and the Legislative Auditor, to function without compensation except reimbursement for actual and necessary expenses out of moneys made available from the appropriation for the support of the Director of Finance. The board is given the duty in subsection (b) to ''prescribe rules and regulations for the general administration of this act, requiring such procedure, forms and information as it deems necessary.'' By subsection (c) the Director of Finance is required to administer the act and provide such assistance to the board as the latter may require.

Section 6 reads: ''The sum of ten million dollars ($10,000,-

000) is hereby appropriated out of any money in the State treasury not otherwise appropriated to be expended pursuant to allocations to local agencies made in accordance with the provisions of this act and for the purpose of administering this act.''

By section 7, $6,875,000 of the $10,000,000 appropriation is permitted to be expended for the purpose of defraying one-half or less, designated as the state's share, of the cost of preparing plans for specific projects to be allocated to local agencies (defined by section 2 as any county, city and county, or city of the state) as provided in section 25. Three million dollars may be expended for one-half or less, called the state's share, of the cost of acquisition by local agencies of rights of way and sites for public works projects in which there is a state interest aside from the relief of unemployment, naming, but not as exclusive, highways, and major street improvement, sewage treatment and disposal plants, and sanitary facilities (§ 16). Fifty thousand dollars is made available for the support of the controller and $75,000 for the support of the Director of Finance (§ 26).

Section 8 provides that a local agency may from time to time apply to the Director of Finance for an allotment of the state's share of the estimated cost of preparing a plan which is defined by section 4 as a set of engineering field surveys and engineering or architectural designs, working and detailed drawings and specifications required for a specific project, including (§ 3) new construction, modifications and alterations (but not ordinary repair and maintenance) of public buildings, streets, bridges and publicly owned and operated facilities,. including but not limited to sewage treatment and disposal plants and sanitary facilities, airports and existing water supply systems, except public utilities not expressly mentioned. The director is required to approve the application within sixty days after receipt of all information requested by him and thereupon make the allotment provided by section 25.

Sections 9, 10 and 11 deal with the method of reimbursement to the local agency, which the board shall by rule prescribe, from the allotted share of the state as the work of preparation progresses.

Section 12 provides that if work is begun on any plan before

the effective date of the act, the estimated cost includes the cost of work done on the plan on and after July 1, 1944.

Sections 13, 14, 15, 17, 18, 19, 20 and 21 are mainly procedural.

Section 22 provides that title to rights of way and sites shall vest, not in the state, but in the local agency making the acquisition. Sections 23 and 24 deal respectively with change of use of a site from that originally intended and return of advances in case of nonuse of a site.

Section 25 prescribes the minimum and maximum amounts for plans and sites to be allotted each county or city and county and the local agencies within each, which are to be computed on the basis of the United States Census of 1940. The section makes it the duty of the Director of Finance to determine the amounts to be allocated to each local agency, according to the specified formulae.

Section 27 provides for reversion to the general fund of any portion of the amount appropriated remaining unexpended or unapplied for prior to December 31, 1945.

Other sections make provision for joint undertakings and for assignments. Section 32 contains the usual severability clause.

Briefly, in order to put into effect a program designed to relieve statewide unemployment to be anticipated upon termination of the present world conflict, the Legislature has appropriated $10,000,000 from the general state fund to be allocated to cities and counties on a so-called matching basis, as state aid in the immediate formulation of plans and the acquisition of sites for the construction of needed public works to commence upon the return to civilian life of a large proportion of the state's population now actively engaged in the war and in the production of war materials.

The enactment may be said to be in concert with the War Mobilization and Reconversion Act of (October 3d) 1944 (chap. 480, Public Law 458, 50 U.S.C.A.App. §§ 1651-1678) adopted for the purpose among others of securing the formulation and execution of plans to meet the problems arising out of the transition from war to peace. Section 501 of that act (50 U.S.C.A.App. § 1671) is intended as an encouragement to immediate planning for public works. Subsection (a) provides: ''In order to encourage States and other non-Federal public agencies to make advance provision for the construction

of public works (not including housing), the Federal Works Administrator is hereby authorized to make, from funds appropriated for that purpose, loans or advances to the States and their agencies and political subdivisions (hereinafter referred to as 'public agencies') to aid in financing the cost of architectural, engineering, and economic investigations and studies, surveys, designs, plans, working drawings, specifications, procedures, and other action preliminary to the construction of such public works: *Provided,* That the making of loans or advances hereunder shall not in any way commit the Congress to appropriate funds to undertake any projects so planned.''

The petitioner city of Los Angeles by Ordinance 88625, approved August 3, 1944, appropriated $2,000,000 to the ''Postwar Public Works Reserve Fund'' to be used to pay the cost of preparation of plans for public works projects, the construction thereof, and the acquisition of sites and rights of way necessary to their completion. The city's appropriation makes available the funds for matching the state funds required to be allocated to the city upon appropriate application therefor. The city proposes to prepare plans for the construction of a $20,000,000 sewage treatment and disposal plant to dispose of sewage from the city of Los Angeles, ten additional cities, four sanitation districts, and surrounding unincorporated territory. The city has already begun work and has expended money for the preparation of the plans. The city also proposes to prepare plans and acquire sites for a public health clinic, a police administration building, several additional fire stations, and an extension of the municipal airport to serve the needs of a large area in Southern California.

The petitioner county of Los Angeles by resolution adopting its budget for the fiscal year 1944-1945, budgeted $3,318,854 to be used for the preparation of plans, acquisition of sites, and construction of certain public works including a court and detention building for use of the county as a Juvenile Hall, Civic Center developments including a new county court house, a park, playground and recreational area in the unincorporated community of Graham, an isolation unit as an adjunct to the county general hospital, a patrol station building in Topanga Canyon to house forest firemen and forest fire fighting apparatus, a salvage warehouse and salvage operation

unit for the purchasing agent, and certain storm drainage and sewer improvements.

The petitioner city of Oakland, by the adoption of appropriation ordinances has provided funds to match state funds available for the preparation of plans and the acquisition of sites in the proposed construction of a sewage treatment and disposal plant to serve the needs of the cities of Oakland, Alameda, Albany, Berkeley, Emeryville and Piedmont, a health center to provide care for expectant mothers, a building to accommodate a central police station, central fire station, and the criminal courts, recreational structures including community center buildings and swimming pools, a central public library, main line sanitary sewers and storm sewers.

In each of the petitions it is alleged that the respondent Post War Public Works Review Board, by resolution adopted on September 13, 1944, has refused to perform the duties imposed on it by the provisions of the act. The purpose of the present proceedings is to compel the respondents to prescribe the rules and regulations for the general administration of the act, the procedure to be followed, the forms and the information to be submitted, to proceed to the allocations of the state funds made available by the legislative appropriation, and to the performance of the other duties required by the act.

The question of the validity of the act requires the consideration of various provisions of the Constitution. First to be noted is the general contention of the respondents that the substantive provisions of the act are not germane to the declared purpose. The respondents urge that the substantive provisions, as distinguished from the stated purpose, bear no relation to the problem of postwar unemployment relief and therefore do not reflect a statewide interest aside from such possible interest in specific works. Whether the relationship exists is, primarily, a question for the Legislature and not for the court. That the Congress had postwar unemployment also in mind when it adopted the provisions of section 501 of the War Mobilization and Reconversion Act is apparent from other sections of that act (see §§ 201, 202, 203(c) (2), 301, 302, 401, 402, Act, §§ 1656, 1657, 1658(c) (2), 1661, 1662, 1666, 1667, U.S.C.A., Title 50, App.) in which it is indicated that the federal government will not retain persons in the armed forces and in war production merely for the sake of furnishing employment, but in which also consideration is given to re-

employment and unemployment. If the declared legislative purpose has a reasonable relation to the provisions of the enactment, judicial inquiry into that question is at an end. (*County of Los Angeles* v. *LaFuente,* 20 Cal.2d 870, 877 [129 P.2d 378]; *County of Alameda* v. *Janssen,* 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141]; *Housing Authority* v. *Dockweiler,* 14 Cal.2d 437, 450 [94 P.2d 794].) A conclusion that the construction of public works projects is reasonably related to the relief of unemployment is supported by experiences following the first world war. Relief then was undertaken in two ways: by direct payment of state funds, and by furnishing employment on public works projects. From these experiences the Legislature may well have determined that the second method was more harmonious with the American way of life. The respondents do not question, in fact they admit, that the Legislature may constitutionally provide for relief from unemployment, and that unemployment relief is a proper state function (Const., art. XVI, §§ 9, 10, 11). That being so, the selection of the direct method or furnishing employment on public works projects is a matter of legislative policy.

The fact that under the present act funds for the preparation of plans and the acquisition of sites are made immediately available and before an acute need for relief of unemployment arises, is also a matter which bears upon the question of legislative policy. When the time is ripe for preparation is a matter for legislative determination. The Legislature may be commended for the use of foresight in meeting a situation normally to be expected by the transition from a war to a peace time basis. The respondents would require some guarantee that the unemployment situation will arise and that the expenditure of the funds will actually serve to alleviate unemployment. Prevention of unemployment is a proper legislative objective equally with relief of existing unemployment. The Legislature should not be held bound to await the actual occurrence of the undesirable condition before commencing preparations for its prevention. It is obvious that if such a plan for relief of unemployment is to operate efficiently, preparation for the commencement of its operation must be made well in advance of the expected need. That the actual need may never become apparent may be due in whole or in part to timely activity in public works construction and may prove nothing more than that the plan was successful. In *Gillum* v.

*Johnson*, 7 Cal.2d 744, at pages 760, 761 [62 P.2d 1037, 63 P.2d 810, 108 A.L.R. 595], this court said: ''History discloses that financial panics, periods of depression or hard times are recurrent. After much investigation, research and thought upon the subject, the legislature has determined that it is wise and prudent policy to provide in advance some measure of security as against the lean years which the future may bring forth. If it be within this reserved power of the state to care for those in need when the actual need is present, and as to this there can be no question, it would seem to be likewise true that to anticipate the necessities of the future is not only a reasonable but a wise and salutary governmental policy. Whether the plan now projected is the best that could be devised is not the question. Economic theorists have divergent views on the subject, but it is not for the court to say whether some other plan would be preferable or that experience may demonstrate the economic fallacy of the particular plan promulgated. If constitutional restraints do not prevent, the legislative power is present.'' And certainly criticism may not be leveled at the legislative policy to provide for employment on much needed public works, rather than on work merely improvised, as a measure for the relief of unemployment.

But, say the respondents, if the funds are expended at this time for plans and sites, and the planned project is never constructed, the state funds have been used, and no relief or prevention of unemployment has resulted. The respondents have overlooked section 24 making provision that moneys advanced for the acquisition of a site which is not used for the purpose should be returned. If the declared purpose of the use of the funds is not prohibited by the Constitution, the fact that in executing the provisions of the act it may transpire that some of the funds through no one's fault will not be devoted directly to the declared purpose, does not of itself negative the otherwise reasonable relationship of the provisions to the purpose.

The respondents state that governmental agencies have long tried to obtain permission and priorities to construct needed public projects during the war, and that, in the event priorities and materials are obtained, a great many projects will be constructed without any relation to the need for construction projects to prevent unemployment. The truth of the asser-

tions, however, is a matter for legislative investigation and determination.

The respondents ask, if insurance of employment is the primary concern, why is it that in choosing particular projects not a word is contained in the act indicating that the amount of employment to be furnished by that project shall be given any consideration. The reason probably is that no more is allocable to any one community than the normal population justifies, and that the Director of Finance is designated as the agency to make recommendations, if recommendations are needed. The legislative determination in that respect is not in this case a matter of judicial concern, so long as the reasonable relationship exists between the act and its declared purpose.

The respondents next assert that there is a complete absence of any factual basis for assuming that postwar unemployment, if any, will occur on a strict formula conforming to the method of allocation set up in the act. They assume that funds for relief of unemployment must be made available where the unemployment exists, consequently construction projects designed to prevent unemployment should be available in areas where they are most needed. What the respondents have in mind is the well known fact that war production concentrates the population in certain central areas. They assert that the use of the 1940 census shows an utter disregard on the part of the Legislature of the changes in population due to the war effort, and that it has based the allocation of funds for postwar unemployment relief on a strict mathematical formula without regard to shifts in population.

It is exceedingly doubtful that the Legislature did not give the matter studied consideration. On the contrary a need for decentralization of the population and a shift back to the rural areas may well have been the motivating purpose in the adoption of the 1940 census as the basis for the proportional allocation of the appropriated sum throughout the state. In assuming that relief must be afforded where the unemployment is to be anticipated, the respondents have made an assumption contrary to experience. From the commencement of immigrations to this country, opportunity has not followed the people, but the people have followed opportunity. They likewise followed it in the first world war, during the subsequent unemployment period when government works projects furnished

the invitation, during the present world war in the migrations to the war industrial centers, and they will retrace their steps in the postwar period to other regions when opportunity again beckons as it will when construction of public works projects is commenced in other areas. The adoption of the current population figures in the enactment of chapter 581, Statutes of 1943 (p. 2154) referred to by respondents proves nothing. That act related to the determination of the wartime population of cities and cities and counties for purposes of the allocation and expenditure of moneys from the State Highway and Motor Vehicle License fee funds. Obviously, the nature of that legislation required a basic computation involving current wartime population figures, while just as obviously, because of the normal dispersal of the population from war industrial and encampment centers after the war, the present act required a computation based on a return to peacetime distribution of population. There is, therefore, a fundamental relation between the figures of the 1940 census and the expected distribution of population when hostilities have ceased.

This branch of the discussion may be closed with the observation that the declared purpose of the act is not merely an artifice to evade the provisions of the Constitution, and that there is a reasonable relationship between the substantive provisions and the declared purpose. It is also true, however, that the reasonable relationship between the declared purpose of the act and its provisions will not excuse a violation of the Constitution.

The respondents contend that the appropriated funds must be administered in accordance with sections 10 and 11 of article XVI of the Constitution. Section 10 was adopted on November 6, 1934, to appropriate and provide for administration through a Relief Administrator of a $24,000,000 fund authorized to be raised by the issuance of unemployment relief bonds and to be expended prior to July 1, 1935, as grants by the state without repayment by any grantee. Also included in such administration were funds made available by the United States Government for unemployment relief within this state. By section 11, adopted on November 8, 1938, notwithstanding any provision of section 10, the Legislature was vested with ''plenary power to provide for the administration of any constitutional provisions or laws heretofore or hereafter enacted concerning the administration of relief. . . .'' Also

included in that section was the provision conferring "power to . . . provide for the administration of the relief of hardship and destitution, whether resulting from unemployment or from other causes, either directly by the State or through the counties of the State, and to grant such aid to the counties therefor, or make such provision for reimbursement of the counties by the State, as the Legislature deems proper." It is apparent from a reading of this provision that it contemplates relief from hardship due to an existing condition of unemployment by distribution of funds or relief directly to the donee. This conclusion is supported by the arguments on the proposed constitutional amendments submitted to the voters in the year of the adoption of section 11, showing that the amendment was designed to overcome a possible construction of section 10 that the provision for a relief administrator was not a mere temporary expedient; also to open the way for appropriate distribution of unemployment relief through the Department of Social Welfare and to provide for joint state and county administration of state aid to those in need and to prevent the hardship and confusion resulting because of different definitions of employability and standards of relief for unemployables adopted by the state and various counties; also to avoid the difficulty of determining the form of aid to which an applicant is entitled, the delays and interruptions in provision of relief, and duplication in investigating eligibility and in keeping records. The purpose of section 11, therefore, was to remove the supposed inhibition of section 10, and to open the way for joint state and county administration of direct relief of destitution and hardship whether resulting from unemployment or otherwise.

The provisions of sections 10 and 11 have no application in the present case. ██ The guiding principle here was reiterated in *Collins* v. *Riley*, 24 Cal.2d 912, 916 [152 P.2d 169], to the effect that the Constitution is not a grant of power but rather a limitation or restriction upon the powers of the Legislature; that the court does not look to the Constitution to determine whether the Legislature is authorized to do an act, but only to see if it is prohibited, and if there is any doubt of the Legislature's power to act in a particular case, the doubt is resolved to uphold constitutional intendments. Restrictions and limitations are not extended to include matters not cov-

ered. (See, also, *Delaney* v. *Lowery,* 25 Cal.2d 561, 568 [154 P.2d 674].)

There is in the sections relied upon no inhibition upon the inherent power of the Legislature to administer the provisions for state aid in the manner selected if otherwise the act is constitutional.

The question then is whether the Legislature may provide aid to municipal agencies for the purposes stated in the act. In this connection the respondents assert that the act violates section 31 of article IV prohibiting the Legislature from giving or lending the credit of the state to a municipal corporation or making any gift of public money to a municipal corporation; also the provisions of section 12, article XI, prohibiting the imposition by the state of taxes for city or county purposes. The respondents concede that such appropriations may be made and taxes imposed therefor if a state purpose is to be subserved by the expenditure of the funds; but they assert that if the funds so collected be appropriated for purely local purposes, the appropriation would constitute a gift in violation of those sections. (*City of Los Angeles* v. *Riley,* 6 Cal.2d 621 [59 P.2d 137, 106 A.L.R. 903]; *County of Los Angeles* v. *Riley,* 6 Cal.2d 625 [59 P.2d 139].)

Section 16 of the act requires that in the acquisition of sites for public works projects with the aid of the appropriated funds there be a state interest in the projects themselves other than unemployment relief. But the respondents state that it is clear from the provisions of sections 3 and 8 that the money appropriated for plans is to be allocated to local agencies without regard to any possible state interest in the project for which the plans are to be prepared. Therefore, say the respondents, the expenditure for plans may be for such as deal with a project of purely local concern.

It is often difficult to draw a distinct line between a matter of statewide and one of purely local concern. In many cases the spheres of operation overlap. (*City of Los Angeles* v. *Riley, supra,* at p. 623; *Gadd* v. *McGuire,* 69 Cal.App. 347 [231 P. 754].) It is well settled, however, that where the project has a state purpose, it is immaterial that in other respects it is local in nature. (*County of Los Angeles* v. *Riley, supra,* at p. 627, referring to *City of Los Angeles* v. *Riley, supra.*)

As we view the immediate problem, it is not necessary to discern in the specific project for which plans are prepared

with the aid of funds made available by the act, a state purpose other than or in addition to the declared purpose of relief of unemployment. The state has an interest in the preparation of plans for and the construction of public works projects undertaken for the relief of unemployment in the period following the cessation of war, even though a local agency also receives a benefit. (See *County of Los Angeles* v. *LaFuente, supra,* p. 876-877, citing many cases; *County of Alameda* v. *Janssen, supra,* p. 282, and cases cited; *Housing Authority* v. *Dockweiler, supra,* p. 451; *Veterans' Welfare Board* v. *Jordan,* 189 Cal. 124 [208 P. 284, 22 A.L.R. 1515]; *Kinney* v. *City of Astoria,* 108 Ore. 514 [217 P. 840]; *State* v. *Davidson,* 114 Wis. 563 [88 N.W. 596, 90 N.W. 1067, 58 L.R.A. 739]; 26 R.C.L. p. 75.) The primary purpose of the use of the money is a public one, namely, to create employment and thus prevent or alleviate unemployment, and it is not to be regarded as a gift although a municipality also may receive a benefit therefrom. (*County of San Diego* v. *Hammond,* 6 Cal.2d 709, 721 [59 P.2d 478, 105 A.L.R. 1155]; *City of Oakland* v. *Garrison,* 194 Cal. 298 [228 P. 433].) It was pointed out in *Veterans' Welfare Board* v. *Jordan, supra,* that if a constitutional object is achieved in addition to the lending of credit or payment of moneys to the local agencies, there is no violation of the constitutional provisions. In that case at page 141 it was said: "Where a separate and distinct public purpose is achieved and such public purpose is one within the constitutional powers of the legislature to bring about, we do not feel that we would be justified in declaring that the law is unconstitutional because of the fact that as an incident to its main purpose the credit of the state is used to effectuate that purpose." So here the constitutional objective of relief of unemployment is decisive, and it is immaterial that local agencies or private individuals may also receive a benefit. The analogy of the Veterans' Welfare Board case (where funds were appropriated to veterans to buy homes as part of a resettlement project) was recognized where municipal agencies were recipients of the appropriated moneys, and the principle held controlling. (*County of San Diego* v. *Hammond, supra,* at p. 724.) The state could have assumed entire control of the matter of unemployment relief, or it could, as it did, call for assumption of a portion of the responsibility by the local agencies. (See *Reclamation Board* v. *Chambers,* 46 Cal.App. 476 [189 P. 479].)

The foregoing answers the objections of the respondents to the provisions of section 12 for reimbursement of funds expended in the work of preparing plans begun after July 1, 1944, and before the effective date of the act. In making the assertion that funds used to pay for such work amount to a gift of public moneys, the respondents are in effect contending that the plans resulting therefrom cannot be connected with the postwar unemployment relief program. However, if the plans the preparation of which was commenced prior to the effective date have the same object and purpose as the after-commenced work, namely, to provide construction work for the relief of unemployment, they obviously have the same relationship to the declared purpose and in the presence of the express provision of section 12 may not be excluded from the benefits of the act. The effective date of the act is not thereby disturbed inasmuch as its provisions for allotment and reimbursement thereunder operate solely in the future. Even if it should be considered retroactive in operation, the rule which permits retroactive operation is complied with by the inclusion of a definite provision showing that to be the legislative intent. (See *Houston* v. *McKenna*, 22 Cal. 550, 554; *Caminetti* v. *Pacific Mutual Life Ins. Co.*, 22 Cal.2d 344, 353 [139 P.2d 908].)

The act does not violate section 34 of article IV of the Constitution providing that no bill making an appropriation of money, except a budget bill, shall contain more than one item of appropriation, and that item for a single and certain purpose to be expressed in the act. It contains but one item of appropriation, the item of $10,000,000, to be devoted on a matching basis solely and exclusively to a program of public works engaged in by cities and counties in the prevention and relief of unemployment anticipated upon the cessation of international hostilities. The fact that of the sum appropriated one specified part thereof *may be* expended for plans, another for acquisition of sites, and others for the cost of administration, does not defeat the singleness or certainty of the expressed purpose; nor does it constitute several distinct items of appropriation. The language employed in the latter respect is not language of appropriation. The appropriation was completed by the provision of section 6 setting aside $10,000,000 out of the moneys of the state treasury not otherwise appropriated. (*Ingram* v. *Colgan*, 106 Cal. 113, 117 [38 P. 315, 39 P. 437, 46 Am.St.Rep. 221, 28 L.R.A. 187].) As in *Ryan* v. *Riley*, 65 Cal.App. 181, 187 [223 P. 1027], there was a "setting apart from the public revenues of a certain sum of money

for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purposes.'' It is an appropriation from the general fund as defined in *Ristine* v. *State*, 20 Ind. 328, 338.

█ Limitations and conditions imposed in the expenditure of the appropriated sum do not defeat the purpose of the appropriation. The fact that the amount is to be expended in installments, or for subsidiary objects looking to the execution of the primary purpose of the act, does not militate against singleness of appropriation or of object. (See *Regents of University of Cal.* v. *Riley*, 199 Cal. 506 [250 P. 182], citing *State* v. *Sloan*, 66 Ark. 575 [53 S.W. 47, 49, 74 Am.St.Rep. 106]; see, also, *People* v. *Dunn*, 80 Cal. 211, 214 [22 P. 140, 13 Am. St.Rep. 118].) Singleness of appropriation and of object in this case distinguishes it from *Murray* v. *Colgan*, 94 Cal. 435 [29 P. 871], and cases following it, relied upon by the respondents. Cases, such as *Wood* v. *Riley*, 192 Cal. 293 [219 P. 966]; *Reardon* v. *Riley*, 10 Cal.2d 531 [76 P.2d 101], and others, were concerned with budget appropriation bills and the power of the governor to veto specific items or to modify the amount. They are not controlling here. The item of appropriation of $10,000,000 for the stated purpose of allocation to cities and counties to carry out the public works projects program to the end declared in the act is therefore one item of appropriation for the one single and certain purpose expressed in the act.

█ The respondents contend that the provisions of section 25 of the act are invalid as special legislation (Const., art. IV, § 25, subd. 33), that its provisions lack uniformity of operation (art I, § 11), and that they constitute a delegation of power to a special commission to control county improvement or property (art XI, § 13).

The pertinent portion of section 25 of the act applies to computation of the maximum amount to be allowed to a county based on the 1940 census, which generally is the sum of the minimum amount and the county area amount to be allocated to all local agencies within the county, including the county, less the sum of the maximum amounts to be allocated to all cities within the county. An exception was included to apply in cases of counties comprising several large urban areas where the maximum amount would be less than ten per cent of the minimum amount and county area amount to be allocated to all local agencies within the county including the

county. In such case a local commission, composed as specified in the section, is to determine the maximum county allocation which shall be not less than 10 per cent of the total allocations to all local agencies within the county including the county, the balance to be divided among the cities according to a ratio based on the 1940 census. The respondents state that, using the 1940 census as a basis, the exception affects only the county of Alameda, which contains several large densely populated urban areas. They contend that there is no reasonable basis for the classification; but it is obvious that the Legislature was aware that any such county would not have an equable distribution of the funds available for allocation to all local agencies within it including the county. It is apparent that discrimination might have followed had the exception not been included to cover such cases. Under those circumstances the fact that but one county is brought within the exception is not the criterion. There is no division drawn between counties of different classes, so that the objection encountered in *In re Brady,* 65 Cal.App. 345 [224 P. 252], is not present. The classification extends to counties of every class where the specified situation exists. It is therefore not discriminatory in the constitutional sense (*Kramer* v. *Reynolds,* 93 Cal.App. 224, 225 [269 P. 573]). Since it is founded upon reason, and is unlimited in operation, the legislative classification is neither special legislation nor lacking in uniformity of operation. (*Martin* v. *Superior Court,* 194 Cal. 93 [227 P. 762].)

The respondents are likewise in error in assuming that the delegation to the commission of the duty to compute the amount of allocations in such cases gives it power to control the city or county improvement or property. There is no control of or interference with the improvements or property of the local agency. The commission's sole duty is to compute the amount of state funds available for matching by the local agency. It is not dealing with municipal but with state property, which the local agency may or may not have allocated to it in accordance with its voluntary decision.

It is therefore concluded that the Legislature had the power to make the appropriation for the declared purpose through the channel provided; that there is but one item of appropriation for but a single purpose, which is expressed in the act; that the Legislature has not made gifts of public moneys to counties or municipal corporations nor imposed taxes for

purely local purposes; and that there is no prohibited delegation of power, nor any local or special legislation involved. The money was appropriated for a public purpose, primarily for the benefit of the people of the state, and any incidental or secondary benefit to municipalities or private persons does not render the appropriation one for an unconstitutional purpose.

It is ordered that the peremptory writ of mandate issue commanding the respondents to proceed in the performance of the duties with which they are charged by the provisions of the act.

Gibson, C. J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Edmonds, J., did not participate therein.