[L. A. No. 26662. In Bank. Feb. 21, 1963.]

THE METROPOLITAN WATER DISTRICT OF SOUTH-
ERN CALIFORNIA, Petitioner, v. JAMES J. MAR-
QUARDT, as Executive Secretary, etc., Respondent;
THE STATE OF CALIFORNIA, Real Party in In-
terest.

Charles C. Cooper, Jr., Alan G. Campbell, Donald J. Whitlock, O'Melveny & Myers, James J. Beebe, Pierce Works and E. G. Chandler for Petitioner.

McCutchen, Black, Harnagel & Shea, Harold A. Black and Jack T. Swafford for Respondent.

John A. Nejedly, District Attorney (Contra Costa), Robert H. Betzenderfer, Deputy District Attorney, Richard W. Dickenson, County Counsel (San Joaquin), Gard Chisholm, Dis-

trict Attorney (Alpine), James E. Deasy, County Counsel (Amador), Charles H. Andrews, County Counsel (Butte), Joseph S. Huberty, District Attorney (Calaveras), Harold R. Wilsey, Jr., District Attorney (Colusa), J. Ralph Arnold, District Attorney (Del Norte), Jack R. Winkler, District Attorney (El Dorado), Clyde H. Larimer, District Attorney (Glenn), Thomas Montgomery, Jr., County Counsel (Humboldt), Fredric S. Crump, District Attorney (Lake), James E. Pardee, County Counsel (Lassen), Frank S. Petersen, District Attorney (Mendocino), Paul B. Baker, District Attorney (Modoc), N. Edward Denton, District Attorney (Mono), Gordon I. Smith, District Attorney (Sierra), Albert H. Newton, Jr., District Attorney (Siskiyou), James M. Shumway, County Counsel (Solano), Henry J. Goff, Jr., District Attorney (Tehama), Donald R. Kennedy, District Attorney (Trinity), Anthony B. Avilla, District Attorney (Yolo), Roy J. Gargano, Kronick, Moskovitz & Vanderlaan, Stanley W. Kronick, Adolph Moskovitz, Richard W. Abbe, District Attorney (Shasta), Calvin E. Baldwin, County Counsel (Tulare), Robert E. Moock and John H. Sutter as Amici Curiae on behalf of Respondent.

Stanley Mosk, Attorney General, Robert Burton, Deputy Attorney General, B. Abbott Goldberg, Deputy Director, Department of Water Resources, and Ralph Alpert for Real Party in Interest.

GIBSON, C. J.—This is a proceeding in mandamus to compel James J. Marquardt, the executive secretary of the Metropolitan Water District of Southern California, to take certain procedural steps necessary to carry out a contract for the delivery of water from the facilities of the State Water Resources Development System to the district. The contract was made on November 4, 1960, between the district and the State of California, acting through its Department of Water Resources, pursuant to the California Water Resources Development Bond Act (Wat. Code, § 12930 et seq.), the sections of the Water Code relating to the Central Valley Project (Wat. Code, § 11100 et seq.), and other legislation. Marquardt's refusal to act is based on his assertion that the contract is invalid.

Mandamus is available to compel an official to perform a ministerial duty, and in a proceeding brought for that purpose courts may determine the validity of govern-

mental contracts and laws authorizing prospective bond issues. (*City of Palm Springs* v. *Ringwald,* 52 Cal.2d 620, 622-623 [342 P.2d 898]; *City of Walnut Creek* v. *Silveira,* 47 Cal.2d 804, 807 [306 P.2d 453]; *Golden Gate Bridge etc. Dist.* v. *Felt,* 214 Cal. 308, 315-318 [5 P.2d 585]; *La Mesa etc. Irr. Dist.* v. *Halley,* 197 Cal. 50 [239 P. 719]; *Montecito County Water Dist.* v. *Doulton,* 193 Cal. 398 [224 P. 747]; *Los Angeles County F. C. Dist.* v. *Hamilton,* 177 Cal. 119 [169 P. 1028]; cf. *City & County of San Francisco* v. *Linares,* 16 Cal.2d 441 [106 P.2d 369].) The questions raised here with respect to the validity of the contract may be divided into two parts—those relating to the constitutionality of the bond act and those based on the assumption that the bond act is constitutional.

I

*Constitutionality of the Bond Act*

A. *Does the bond act violate the provision of article IV, section 24, of the Constitution that every act shall embrace but one subject and that the subject shall be expressed in the title?*

The bond act is entitled: "An Act to add Chapter 8 (commencing with Section 12930) to Part 6 of Division 6 of the Water Code, relating to provision for the development of the water resources of the State by providing the funds necessary therefor through the issuance and sale of bonds of the State of California, and by providing for the handling and disposition of said funds, and providing for the submission of this act to a vote of the people at the general election to be held in the month of November, 1960." (Stats. 1959, ch. 1762, p. 4234.)

A determination of this question requires a brief summary of the provisions added to the Water Code by the bond act.[1] Section 12931 provides that the object of the act is the construction of a State Water Resources Development System which is to be composed of the facilities enumerated in section 12934, subdivision (d), and certain additional facilities. The principal facilities enumerated in subdivision (d) of section 12934 are: (1) a multiple purpose dam and reservoir on the Feather River in the vicinity of Oroville, together with other dams and reservoirs upstream,

---

[1] Where section numbers are stated without further specification they relate to the Water Code.

(2) an aqueduct system to distribute water to various parts of the state, and (3) master levees, control structures, channel improvements, and appurtenant facilities in the Sacramento-San Joaquin Delta to conserve water and transfer it across the Delta. Subdivision (d) also lists: (4) facilities for removal of drainage water from the San Joaquin Valley, (5) facilities for the generation and transmission of electrical energy, and (6) water development facilities in local areas as provided in section 12880 et seq. The facilities authorized by the act in addition to those enumerated in subdivision (d) include such other facilities as the department deems necessary and desirable to meet local needs and to augment the supplies of water in the Delta. (§§12931, 12938.) A bond issue is authorized in the amount of $1,750,000,000 (§ 12935), and money is appropriated from several sources to meet the costs of construction, operation, and maintenance of the system, including the payment of bonds with interest.[2] Some of the facilities referred to in the act are authorized only by it, while some are authorized by other statutory provisions as well.

 Section 24 of article IV must be construed liberally so as to uphold legislation all parts of which are reasonably germane, and a provision which is auxiliary to and promot-

[2]The appropriation provisions are as follows:

1. In section 12937, subdivision (a), an appropriation is made from the General Fund of a sum annually necessary for principal and interest of the bonds.

2. In section 12937, subdivision (b), it is provided that revenues derived from the water system shall be deposited in a special fund to be used only for costs of maintenance and operation, principal and interest on the bonds, and reimbursement for funds taken from the California Water Fund for construction of the system.

3. In section 12937, subdivision (b)(4), there is an appropriation of surplus revenue to form a special fund for the acquisition and construction of the system.

4. In section 12938 an appropriation is made of the proceeds from the sale of bonds to form a special fund for the State Water Facilities as defined in section 12934, subdivision (d), and for construction of additional facilities mentioned in sections 12931 and 12938.

5. In section 12938 $130,000,000 of the total amount of the bonds is made available exclusively for local projects of public agencies mentioned in sections 12934, subdivision (d)(6), and 12880.

6. In section 12938 all moneys in the California Water Fund are appropriated for the system, unless the Legislature in any year appropriates any unexpended money therein for other purposes.

7. In section 12938 an amount from the sale of bonds equal to the amount of money from the California Water Fund that is expended for construction of the State Water Facilities is appropriated for additional facilities of the system which the department deems necessary and desirable to meet local needs and to augment the supplies of water in the Delta.

ive of the main purpose of the act or has a necessary and natural connection with that purpose is germane within this rule. ▮▮ Provisions governing projects so related and interdependent as to constitute a single scheme may be properly included within a single act, and, the general purpose of a statute being declared, the details provided for its accomplishment will be regarded as necessary incidents. (*Perry* v. *Jordan*, 34 Cal.2d 87, 92-93 [207 P.2d 47].)

Directly in point is *Tarpey* v. *McClure*, 190 Cal. 593, 597 [213 P. 983], which upheld the California Water Storage District Act (Stats. 1921, ch. 914, p. 1727) against the contention that it violated section 24 of article IV by containing more than one subject, namely, provisions for flood control, storage and distribution of irrigation water, drainage and reclamation of land, and generation and use of hydroelectric energy as a by-product. The court held that the act had but a single object, i.e., "the better control and utilization of water, or, stated differently, the reclamation and use of waste water, and incident thereto, the reclamation and use of waste land."

Similarly, all provisions of the present bond act must be considered as relating to one subject. Both the drainage and the electrical energy provisions are germane to the development of the water resources of the state. The Legislature clearly intended them to be integral parts of the system (see sections 12931 and 12934, subdivision (d), *supra*), and there is a reasonable basis for treating them in this manner. Successful irrigation may be dependent on adequate drainage, and this is the situation in the San Joaquin Valley. Power development is an essential part of the project, both to make it economically feasible and to provide the energy required for pumping in connection with the transportation of water. The provision for water development facilities for local areas contained in section 12934, subdivision (d) (6), *supra,* does not constitute a separate subject because section 12880, subdivision (b), provides that assistance to such local projects may be given only "if it is determined that the project substantially conforms to The California Water Plan," which is described in section 10004.

▮▮ The title of the bond act is broad enough to express the whole subject contained in the act. ▮▮ Under section 24 of article IV "the title of an act need not embrace an abstract or catalog of its contents, but need only contain a

reasonable intimation of the matters under legislative consideration." (*Harris* v. *Fitting*, 9 Cal.2d 117, 120 [69 P.2d 833]; *Heron* v. *Riley*, 209 Cal. 507, 510 [289 P. 160].)

Here the title shows that the act relates to the development of the water resources of the state not only by providing for funds through the issuance of bonds but also "by providing for the handling and disposition of said funds" and the latter part of the title is sufficient to include authorization for the construction of the works which were not previously authorized.

B. *Does the bond act violate the provision of article IV, section 34, of the Constitution that "No bill making an appropriation of money, except the Budget Bill, shall contain more than one item of appropriation, and that for one single and certain purpose to be therein expressed"?*

What is said in the preceding subdivision of this opinion about the singleness of subject of the bond act in relation to article IV, section 24, obviously applies to the singleness of purpose with respect to article IV, section 34, and therefore all appropriations contained in the act are necessarily for one purpose.[3] (*City of Los Angeles* v. *Post War etc. Board*, 26 Cal.2d 101, 116-117 [156 P.2d 746] [holding that an appropriation was for a single purpose where it was to be expended for several subsidiary objects looking to the execution of one primary purpose].)

The fact that several appropriations are made in the act (see fn. 2) does not mean that there is more than "one item of appropriation" as the term is used in section 34 of article IV. Where a statute sets up a number of special funds for a single purpose, or there are a number of allocations of money from different funds for that one purpose, the allocations, considered together, should be treated as being only "one item of appropriation." *Veterans' Welfare Board* v. *Jordan*, 189 Cal. 124, 147-148 [208 P. 284, 22 A.L.R. 1515], on its facts directly supports this construction of the Constitution. Where, as in the *Veterans' Welfare Board* case and as here, a single large and complex public project must be financed from different sources, including bonds, it would be most unfortunate if allocations of funds from such sources could not be made in a single act embracing all aspects of that project. Numerous bond acts

---

[3]For this question we assume, without deciding, that a bond act, although approved by the voters, is a "bill making an appropriation of money" within the meaning of article IV, section 34.

in recent years have each included a number of separate allocations of money, and it is thus apparent that the Legislature has construed the Constitution as permitting this practice.[4] The cases of *Sullivan* v. *Gage,* 145 Cal. 759, 771 [79 P. 537], and *Murray* v. *Colgan,* 94 Cal. 435, 437 [29 P. 871], which involved appropriations for purposes other than bonds or bonded indebtedness, are disapproved insofar as they may be inconsistent with the conclusion we have reached.

C. *Does the bond act violate the provision in section 1 of article XVI of the Constitution which prohibits the creation of liabilities in excess of $300,000 "unless the same shall be authorized by law for some single object or work to be distinctly specified therein"?*

The question whether the obligations created by the bond act are for a "single object or work" as these words are used in section 1 of article XVI is analogous to the questions considered above as to whether the bond act embraces but one "subject" for the purpose of section 24 of article IV and whether the appropriation is for a single "purpose" under section 34 of article IV. In accordance with what we have said with respect to those questions, the matters embraced by the bond act are germane to one plan, and the obligations created are for a "single object." Under these circumstances it is apparent that specification of a plan in broad and general terms will be sufficient to meet the requirement of section 1 of article XVI that the object be "distinctly specified" in the act, and the description of the State Water Resources Development System in sections 12931 and 12934, subdivision (d), *supra,* adequately specifies the broad purpose of the bond act.

D. *Does the bond act authorize bond maturities in excess of the 50-year limit prescribed by article XVI, section 1, of the Constitution?*

Article XVI, section 1, of the Constitution prohibits the

---

[4]E.g., Veterans Bond Act of 1958, Stats. 1959, 1st Ex. Sess. 1958, ch. 93, p. 325 (Mil. & Vet. Code, §§ 996.64, 996.66, 996.67, 996.70, 996.72); Veterans Bond Act of 1956, Stats. 1957, 1st Ex. Sess. 1956, ch. 38, p. 371 (Mil. & Vet. Code, §§ 996.49, 996.51, 996.52, 996.55, 996.57); Veterans Bond Act of 1954, Stats. 1955, 1st Ex. Sess. 1954, ch. 28, p. 284 (Mil. & Vet. Code, §§ 996.29, 996.31, 996.32, 996.35, 996.37); Veterans Bond Act of 1946, Stats. 1947, 1st Ex. Sess. 1946, ch. 18, p. 23 (Mil. & Vet. Code, §§ 993.5, 993.6, 993.8, 993.9, 994.2); Veterans Bond Act of 1943, Stats. 1943, ch. 585, p. 2162 (Mil. & Vet. Code, §§ 990.5, 990.6, 990.8, 990.9, 991.2).

creation of debts or liabilities in excess of $300,000 unless the authorizing law "shall provide ways and means . . . to pay and discharge the principal of such debt or liability within 50 years of the time of the contracting thereof . . . ." Section 12936 permits the issuance of bonds in different series at different dates, each series with a maturity of not more than 50 years after the date of the series. Therefore the maturity date of any later series may be more than 50 years after the date of the first series. It is contended that "the time of the contracting thereof" means the "contracting of the first part thereof" and that the constitutional limit is thus exceeded. The contention is unsound. No debt or liability upon any bond is contracted before the bond has been sold and delivered. (*Clark* v. *City of Los Angeles,* 160 Cal. 30, 44-45 [116 P. 722]; cf. *Faulkner* v. *California Toll Bridge Authority,* 40 Cal.2d 317, 325 [253 P.2d 659]; *City of Venice* v. *Lawrence,* 24 Cal.App. 350, 355 [141 P. 406].)

 E. *Does the bond act violate the provision for separation of powers contained in section 1 of article III of the Constitution by delegating legislative power to the Department of Water Resources?*

It is contended that the provision of section 12938 that "the department is authorized to construct any and all facilities for which funds are appropriated to it for expenditure pursuant to this chapter" is so broad and so devoid of standards that it constitutes an unconstitutional delegation of legislative power.

 The standards laid down by the Legislature for administrative action need not be minutely defined, and it is sufficient if they can be found by implication from the general purposes of a statute and from the reasons which must have led to its adoption. (*Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control,* 57 Cal.2d 749, 760 [22 Cal.Rptr. 14, 371 P.2d 758].)

 This rule is satisfied by the standards contained in the bond act. Section 12931 makes the provisions of the code governing the Central Valley Project applicable to facilities acquired or constructed as part of the State Water Resources Development System.[5] One of these provisions, section 11454, subdivision (b), authorizes the department to "do any and all things which in its judgment are necessary, convenient, or

---

[5]The provisions governing the Central Valley Project, made applicable by section 12931, are to be found in part 3 of the Water Code, §§ 11100-11925.

expedient for the accomplishment of the purposes and objects of this part.'' Another, section 11452, requires that the department shall proceed with the construction of the project immediately upon funds becoming available and carry such work to completion as rapidly as possible. In *Holloway* v. *Purcell*, 35 Cal.2d 220, 231-232 [217 P.2d 665], it was held that an adequate standard to guide the commission in determining when and where freeways were to be constructed was provided by the requirement that the Highway Commission exercise its authority on ''such terms and conditions as in its opinion will best subserve the public interest.'' Here, as there, the conduct of an important public enterprise requires that broad power and discretion be granted to the administrative agency in charge of the project.

F. *Was the publication of the bond act insufficient because the entire text of the State General Obligation Bond Law, which was ''adopted'' in the bond act, was not printed in the ballot pamphlet?*

The bond act adopts the State General Obligation Bond Law (Gov. Code, §§ 16720-16774), which prescribes the formal procedure for the issuance, sale, and repayment of bonds in general, and the act provides that the provisions of that law are included as though set out in full. (§ 12932.) It is contended that both article XVI, section 1, of the Constitution and section 16723 of the Government Code required the printing of the State General Obligation Bond Law in the ballot pamphlet accompanying the submission of the bond act to the people and that, because this was not done, the bond act was improperly submitted and is invalid.

It was not necessary to print the general bond law in the ballot pamphlet. The relevant part of article XVI, section 1, adopted by constitutional amendment in 1956 reads: ''Full publicity as to matters to be voted upon by the people is afforded by the setting out of the complete text of the proposed laws, together with the arguments for and against them, in the ballot pamphlet mailed to each elector preceding the election at which they are submitted, and the only requirement for publication of such law shall be that it be set out at length in ballot pamphlets which the Secretary of State shall cause to be printed.'' The general bond law was an existing law, not a ''proposed'' one, and was not part of the text of the bond act but was merely incorporated by reference. The meaning of ''text'' is the exact written or printed

178

words of a work. (See Webster's Third New Internat. Dict. (1961) p. 2365; 11 Oxford English Dictionary (1933) p. 238.) The words of the bond act provide for the adoption of the general bond law (§ 12932), but the bond act does not contain the words of the general bond law—it only states that it adopts that law.

Section 16723 of the Government Code, enacted in 1953, expressly required the printing of two separate texts: "the entire text of this chapter" (i.e., the general bond law) and the "text of the bond act."[6] However, section 1 of article XVI of the Constitution was amended in 1956 to provide that the only requirement for publication was the setting out of the text of the proposed law, and this necessarily superseded the inconsistent statutory provision that the text of the general bond law should also be set out.

It may be noted that the fact that the general bond law is not printed does not deprive the voters of essential information. The general bond law contains only the formal procedure for the issuance, sale, and repayment of bonds, which would not ordinarily be expected to influence the voters in approving or rejecting any particular bond act. The matters which will be of primary interest to the voters, namely, the amount of the bonds authorized to be issued and the purpose for which the proceeds of the bonds may be used, will be found in each proposed bond act. (See Gov. Code, § 16724, subd. (a).)

## II

### *Validity of the Contract*

 A. *Is the contract void for lack of mutuality?*

It is the general rule that a contract lacks mutuality when one party has unrestricted power to impair its obligation, and it is argued that the state has such power here because the contract is between it and one of its own agencies. Reliance is placed on cases such as *Trenton* v. *New Jersey*, 262 U.S. 182, 187 et seq. [43 S.Ct. 534, 67 L.Ed. 937, 29 A.L.R. 1471], and *Mallon* v. *City of Long Beach*, 44 Cal.2d 199, 209 [282 P.

---

[6]Section 16723 of the Government Code reads in part: "Any bond act may adopt the provisions of this chapter by reference to its short title, and such reference shall serve to incorporate the provisions of this chapter in said act as though set out in full therein. . . . Whenever any bond act so adopting this chapter contains a provision providing for the submission of the bond act to the people of the State of California for approval, in the required publication of the bond act prior to the election, the entire text of this chapter shall, in addition to the entire text of the bond act, be printed at length in said publication."

2d 481], for the proposition that the contract clause of article I, section 10, of the federal Constitution does not preclude a state from enacting legislation which impairs its contracts with one of its municipalities.

Even if we assume that the state could constitutionally impair the contract obligation it does not follow that the contract is illusory. The rule that a bilateral contract not binding on one party is illusory is subject to many exceptions. (See Rest., Contracts, §§ 80, 84(e); 1 Corbin on Contracts (1950) § 146, pp. 465-468; 1 Williston on Contracts (3d ed. 1957) § 105, pp. 414-419.) As pointed out in section 84(e) of the Restatement, a contract does not lack mutuality where the promise of one of the parties is unenforceable or voidable because of "a special privilege not expressly reserved in the promise but given by the law." Well-known examples of such exceptions are voidable contracts of infants and insane persons. Of particular significance is illustration 8 of section 84(e) of the Restatement, which reads: "A makes a bilateral agreement with the United States Government. The promise of the Government though unenforceable is not, because of that, insufficient consideration for A's promise." (See also 1 Corbin, supra, p. 468.) A similar exception must be recognized here. No authority contrary to this view has been cited or found, and, if the rule were otherwise, all contracts between the state and its subdivisions would be void.

Although what we have said above disposes of the legal point raised, it is important to note that there are factors tending to protect those interested in this contract against arbitrary action by the state. Section 12937, subdivision (b), provides that, so long as bonds authorized by the bond act are outstanding, contracts for the sale and delivery of water shall not be impaired by subsequent acts of the Legislature, and article XVI, section 1, of the California Constitution provides that laws authorizing liabilities of the state in excess of $300,000 shall be irrepealable until the principal and interest thereon shall be paid and discharged. Moreover, nothing in the Trenton case indicates that the rights of private bondholders would not be protected by the contract clause of the federal Constitution. Even after all bonds are paid, it is to be assumed that no change in the contract would be made by the state unless reasonably required by the public interest.

It is not true, as asserted, that the contract by its terms gives the state uncontrolled discretion to avoid performance.

Section 11452 requires that the department shall proceed with the construction of the project immediately upon funds becoming available and shall carry such work to completion as rapidly as possible. This statutory provision became part of the contract even though not referred to in it. (Cf. *Alpha Beta Food Markets, Inc.* v. *Retail Clerks Union*, 45 Cal.2d 764, 771 [291 P.2d 433].) The contract expressly provides that the state shall make all reasonable efforts for the satisfaction of water supply commitments under the contract (art. 16(b) ) and shall design and construct the project transportation facilities so as to provide the capacity necessary to permit delivery of project water to the district and to other contractors as provided in their contracts (art. 17(b)).

 B. *Is the contract invalid on the theory that no bonds can be issued because the amount of indebtedness provided for in the act is insufficient to complete the entire system?*

Although the amount of the indebtedness authorized in section 12935, namely, $1,750,000,000, was estimated to be sufficient for the completion of the facilities and additions mentioned in that section, it is alleged by Marquardt that the funds available under the bond act, even if other funds possibly available are added, will be insufficient to complete these facilities.

The contention is made that the ratification of the bond act by the voters, who represent the taxpayers, gave rise to a relationship between the state and the taypayers analogous to an agreement which may not be altered to the detriment of the taxpayers without their consent; that section 12935, which authorizes the issuance of the bonds for the "completion" of the system, formed a part of such agreement; that the use of the bond proceeds for anything less than the completion of the system would be an expenditure for a purpose other than that authorized by the voters; and that therefore the bonds may not lawfully be issued.[7]

Section 12931 declares that the object of the bond act is to provide funds "to assist" in the construction of a State Water Resources Development System. The facilities to be constructed with the proceeds of the bonds are stated generally without specification as to size, mode of construction, exact location, or amounts to be spent on any particular facility, and no allowance is made for increase in costs during

[7]Section 12935 provides that the creation of a debt in the amount of $1,750,000,000 is authorized "to provide for the acquisition, construction and completion of the State Water Facilities herein specified."

the long period of construction. A public body may submit bond propositions in broad and general terms or may make them specific if it is willing to be bound by such terms (*O'Farrell* v. *County of Sonoma*, 189 Cal. 343, 347 [208 P. 117]), and, when bonds are proposed in accordance with a program based on estimated costs, the improvements may be carried out to the extent of the funds available. (*Sacramento Mun. Util. Dist.* v. *All Parties*, 6 Cal.2d 197, 202 [57 P.2d 506].) In the present case the fact that it may cost more than $1,750,000,000 to complete the system does not prevent lawful issuance of the bonds or result in invalidity of the contract.

C. *Does the provision in article 45 of the contract that all project water contracts "shall be substantially uniform with respect to basic terms and conditions" violate the provision of section 12937 that the department shall enter into water sales contracts "subject to such terms and conditions as may be prescribed by the Legislature"?*

The quoted language of section 12937 constitutes no more than a reservation of power in the Legislature. It does not require the Legislature to prescribe any terms for contracting, and it does not differ in character from the reservation which is present, whether or not expressly set forth, whenever the Legislature by a law not submitted to the voters grants an executive or administrative body authority to act. Obviously, here, as in that situation, action of the governmental body coming within the scope of authority granted to it cannot be affected by such a reservation unless the Legislature exercises its reserved power in a manner inconsistent with the action taken.

As we have seen, the department has broad discretion to "do any and all things which in its judgment are necessary, convenient, or expedient for the accomplishment of the purposes and objects of this part." (§ 11454, subd. (b).) Within the scope of that discretion the department could reasonably determine that the inclusion of the uniformity provision was desirable for an equitable apportionment among the various contractors of the costs of the project which, under the bond act, must be defrayed by means of the charges paid by the contractors.[8] The Legislature has not exercised its power in

[8]Section 11455 provides: "The department shall enter into such contracts and fix and establish such prices, rates, and charges so as at all times to provide revenue which will afford sufficient funds to pay all costs of operation and maintenance of the works authorized by this part, together with necessary repairs and replacements thereto, and which

any manner inconsistent with the uniformity provision. Although it considered the contract extensively in the 1961 session after the bond act had been passed, it did not enact any legislation requiring changes, and, under the circumstances, its inaction indicated approval of the provision.[9]

▮▮▮▮ D. *Is the contract invalid on the theory that the water charges, which under article 45 must be substantially uniform as to all contractors, are higher than required by law and so high that some users will not be able to purchase irrigation water?*

The contract contains a single system of fixing charges which is to apply without distinction according to the purpose for which the water will be used or the ability of users to pay and which is designed to repay "all costs" of the project, including construction of facilities as well as operation and maintenance. (Art. 22 et seq.) The construction of project facilities is financed not only from the proceeds of bonds but also from the California Water Fund and the General Fund. The only statutory requirement as to the amount of the charges is that they be sufficient to return the costs of operation and maintenance and to pay off the bonds with interest. (§ 11455, see fn. 8, *supra.*) Since the contractual charges are based on the repayment of all costs, including costs of construction financed by money from the California Water Fund and the General Fund, the charges are higher than the minimum provided for by statute.

The contention is made that the facilities of the project were intended to benefit not only contractors like the district involved here but also prospective contractors in predominantly agricultural areas and their agricultural water users; that the charges provided for in the contract are beyond the ability of some agricultural users to pay as well as higher than the minimum required by law; and that, therefore, the charges frustrate the purpose of the law and are unauthorized.

In May 1957 the department pointed out to the Legislature that no rate-fixing policy with respect to the sale of water by the state had been established by statute, and it suggested

will provide at all times sufficient funds for redemption of all bonds and payment of interest thereon, as and when such costs and charges become due and payable.''

[9] Article 2 of the contract provides that the contract would not become effective until after adjournment of the 1961 session and that if legislation were adopted which would require modifications the contract would be void unless the district executed amendments incorporating the modifications.

that irrigation water rates should not be in excess of the water users' ability to pay, after allowance for a reasonable margin of profit, and that some price preference should be given to irrigation. (The California Water Plan, Dept. Water Resources Bull. No. 3, pp. 225-226.) However, no statute adopting this suggestion was passed, and the department's discretion in regard to charges remains unrestricted except for section 11455, which, as we have seen, requires the fixing of charges sufficient for payment of operation and maintenance costs and of the bonds with interest. Section 11455 does no more than state a mandatory minimum of charges, leaving the department free to charge more, as is shown by the fact that section 12937, subdivision (b), anticipates that after the payments required by section 11455 have been made out of the income derived from the project, a surplus may be available for other purposes. Neither section 11455 nor any other section makes mention of preferential charges for agricultural users, so that such a preference, while not prohibited, is not required.

One class of users obviously is not entitled as a matter of law to preferential prices unless the Legislature has provided for such special treatment, and it follows that the department cannot be compelled to establish reduced charges for agricultural users in the absence of a clear expression of legislative intent to that effect. As we shall see, the legislative history shows that the Legislature did not intend to grant a subsidy to irrigators and that it acquiesced in the policy followed in the contract.

Prior to entering into the contract the department, on January 21, 1960, released a statement entitled "Contract Principles," which declared that the contracts to be negotiated would provide for repayment of all construction costs (par. 3) and for a system of charges as contained in the present contract (par. 4 et seq.). (See Partial Report of the Senate Fact Finding Committee on Water Resources of March 1960, pp. 51-53.) Thereafter, committees of both the Assembly and the Senate recommended, in keeping with these principles, that there be recovery of all costs and that the state make no differentiation in charges according to the purposes for which water was used, and in this connection the committee reports stated that a contractor could differentiate between groups of ultimate consumers so as to give preferential treatment to irrigation and that the use of such price dif-

ferences in certain areas was anticipated. (See 26 Assembly Interim Committee Report No. 1, Economic and Financial Policies for State Water Projects (Feb. 1, 1960) pp. 5, 30; Partial Report of the Senate Fact Finding Committee on Water Resources of March 1960, pp. 10, 15.)[10] The Assembly committee also recognized that the ability of all landholders to pay may not be the same but may vary in accordance with the quality of the land and that water priced in accordance with ability to pay may lead to uneconomical use of poor land. (See 26 Assembly Interim Committee Report No. 1, *supra,* pp. 37-39.)

An important indication of acceptance of the "Contract Principles" by the Legislature is the fact that it, with knowledge of these principles, appropriated funds for the project in the Budget Act of 1960 (Stats. 1961, ch. 11, p. 20, items 257, 353, 354, 355) and continued the making of appropriations thereafter. The Legislature, as we have seen, reviewed the contract at length. The Senate passed several bills which would have altered the pricing provisions so as to favor agricultural users, or users north of the Sacramento-San Joaquin Delta, but all failed in the Assembly. No legislation requiring changes in the contract was enacted.

Under these circumstances it cannot properly be said that the Legislature intended to give agricultural users preferential treatment merely because it authorized the construction of facilities designed in part to benefit such users. The absence of preferential treatment by the state will not necessarily exclude any agricultural users from the benefits of the project since, as noted above, contractors may nevertheless grant preferential rates to such users.

E. *Is the provision of article 18(a) of the contract, which for drought periods imposes greater reductions on delivery of water for agricultural uses than on delivery for all other uses, invalid because it does not conform with the policy declared in section 106?*

Section 106 declares that it is "the established policy of the State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation," thus ranking agricultural use above industrial and all other uses except domestic. This statement of policy does not

---

[10]The report of the Senate committee, on page 15, also states that, should some districts be so predominantly agricultural as to make preferential treatment for irrigation infeasible, "super districts" could be formed which would include a greater diversity of users.

specify under what circumstances or to what legal problems it is applicable or, when applicable, what weight it is to be given. It was derived from an old principle relating to apportionment among riparians (see 1 Wiel, Water Rights in the Western States (3d ed. 1911) pp. 795-798), and it first appeared in our statutes as part of a section relating to appropriation of water (Stats. 1921, ch. 329, p. 443.)[11] No case has been cited which applies the policy outside these fields. Even as to applications for appropriation of water the policy is not conclusive; section 1257 provides that the relative benefits to be derived from all uses of the water concerned shall be considered.

The general statement in section 106 is also subject to the provision of section 107 that such a policy declaration is not exclusive and that all other policy declarations in the code should be given full force and effect. The policy declarations with respect to water development projects (§§ 12578, 12580, 12581) show that full consideration is to be given to all beneficial uses of the state's water resources, including flood control, irrigation, generation of electric energy, municipal and industrial consumption of water and power, etc. Section 12601 provides that the department shall "establish general policies" and prescribe rules and regulations for the general administration of the chapter of the code which includes these policy declarations.

Section 11454, subdivision (b), contained in the part of the code relating to the Central Valley Project, made applicable by section 12931, gives the department broad powers and discretion to enter into contracts and to do all things which in its judgment are necessary, convenient, or expedient for the accomplishment of the purposes of the State Water Resources Development System. Section 11126, contained in the same part of the code, provides that the project "is in all respects for the welfare and benefit of the people of the State, for the improvement of their prosperity and their living conditions, and the provisions of this part shall therefore be liberally construed to effectuate the purposes and objects thereof."

The statutes discussed above show that the policy statement in section 106 does not restrict the broad discretionary powers of the department so as to prevent the adoption of

---

[11]Such a provision is now contained in section 1254, which specifically declares that the State Water Rights Board shall be guided by this policy in acting upon applications to appropriate water.

article 18(a), which appears to be in accord with general reclamation practices.[12]

 F. *Is the provision of article 30 of the contract that a "surcharge" will be made for project water put to agricultural or manufacturing use on land of one owner in excess of 160 acres void on the theory either that there is no statutory authority for it or that both the imposition of such a surcharge and the method of its determination are arbitrary and discriminatory?*

Section 11454 authorizes the department to prescribe the "terms, limitations and conditions" under which it will establish rates and enter into contracts for the sale and disposition of the resources made available by the project. There is no statutory limitation on the discretion granted in the section which could prevent the department from prescribing the terms contained in article 30.

 Those who attack the imposition of the surcharge have not sustained their burden of showing that it is discriminatory so as to violate the due process or equal protection clauses. Differentiation in water rates charged to customers differently situated is not in itself objectionable as discriminatory (*Durant* v. *City of Beverly Hills*, 39 Cal.App.2d 133, 139 [102 P.2d 759]), and there appears to be a reasonable basis for the difference in treatment involved here. The state provides the project water at cost but sells project power at market value and uses the power revenues to reduce the cost of water, thus granting water users a subsidy. The surcharge is calculated on the basis of the power profits used to subsidize water users and has the effect of limiting the amount of the subsidy received by persons who have large land holdings, a circumstance which tends to indicate that they are less in need of subsidy.

Our conclusion is supported by *Ivanhoe Irr. Dist.* v. *McCracken*, 357 U.S. 275, 297 [78 S.Ct. 1174, 2 L.Ed.2d 1313], where the United States Supreme Court upheld, as making a reasonable classification, federal reclamation statutes requiring contracts relating to water developed with federal funds to contain a restriction, more severe than the one before us. That restriction prevented the delivery of water for use on land of one owner exceeding 160 acres unless the owner

---

[12]See Chas. T. Main, Inc., Final Report, General Evaluation of the Proposed Program for Financing and Constructing of the State Water Resources Development System (1960) p. 9-6; Hearing of Senate Fact-finding Committee on Water Resources, February 10, 1961, Trans. p. 30.

agreed to dispose of the excess land at a price that would exclude any increase in value resulting from the reclamation project.

It is contended that the method for determining the amount of the surcharge for the use of project water on land in excess of 160 acres is arbitrary in view of the provisions of article 30(e), which set forth special rules to be followed where a contractor or water user "commingles project water with water from another source in a common distribution system." Article 30(e) (1) provides that if the amount of nonproject water delivered by the contractor is equal to or greater than the total quantity of water used for agriculture or manufacturing on all excess land in the area, it shall be presumed that the water put to such use on the excess land is nonproject water, and there shall be no surcharge. Article 30(e)(2) provides that if the amount of nonproject water delivered by the contractor is less than the total quantity of water used for agriculture or manufacturing on all excess land, it shall be presumed that the amount of project water put to agricultural or manufacturing use on the excess land of each owner bears the same proportion to the total amount of water used on that land as the total amount of project water delivered by the contractor bears to the total amount of water delivered by the contractor.

The purpose of article 30(e) is to solve by means of presumptions the difficult problem of determining the extent, if any, to which a landholder who uses commingled water on his excess land should be required to pay a surcharge for the use of project water on that land, and it is undisputed that resort to presumptions is necessary to solve this problem. Although the terms of article 30(e)(1) are obviously more advantageous than the terms of article 30(e)(2), the difference between the two provisions is reasonably justifiable. Contractors having enough nonproject water to serve all excess land and thus coming within (e)(1) could avoid the use of any project water on the excess land by not commingling the water and by serving that land with nonproject water only. In order to do so, however, those contractors would be required to build separate distribution facilities, and it is reasonable, as provided in (e)(1), to free those contractors from the surcharge without such needless expenditures. On the other hand, those coming within (e)(2) must use some project water to serve excess land since the supply of nonproject water is insufficient for that purpose. Moreover, the fact that a sur-

charge will have to be paid provides an incentive for the development of additional nonproject water supplies wherever possible, an objective in accord with the state policy that project water should only supplement local supplies. (See The California Water Plan, Dept. Water Resources Bull. No. 3 (May 1957) p. 38.)

The objection is made that the method of calculating the surcharge as set forth in (e)(2) may cause inequitable treatment of some users to whom the provision applies. It is pointed out, for example, that the provision does not allow an owner any credit for his use of nonproject water on his excess land if he has obtained that water from sources other than the contractor and has commingled it with water obtained from the contractor which contains project water. There is no claim that situations giving rise to inequitable treatment will occur in the district involved here, and the contract does not prevent modification of the details of calculating the surcharge in agreements with other contractors where such difficulties are anticipated.[13] Although the principle of imposing a surcharge based on power revenues which are used to subsidize water users may be "basic" to the contract within the meaning of the uniformity provision of article 45, the details of calculating the surcharge are not basic provisions which cannot be modified.

Even if the surcharge provisions of article 30(e) might lead to some imperfect results, this would not justify holding the provisions invalid. �In▊ A classification having some reasonable basis does not violate equal protection merely because in practice it results in some inequality. (*Morey* v. *Doud*, 354 U.S. 457, 463 [77 S.Ct. 1344, 1 L.Ed.2d 1485].)

▊ G. *Is the contract invalid because it does not contain the 160-acre limitation provided for in federal reclamation law?*[14]

---

[13]It appears that in some agreements with other contractors who are in situations different from that of the district, the presumption has been modified to take into account nonproject water obtained by a user from sources other than the contractor.

[14]The federal statutes regarding the 160-acre limitation are section 5 of the Reclamation Act of 1902, 32 U.S. Stat. 389, 43 U.S.C. § 431, and acts amendatory and supplementary thereto. Section 5 provides in part that no right to the use of water for land in private ownership shall be sold for a tract exceeding 160 acres to any one landowner and no such right shall permanently attach until all payments therefor are made.

The provision which is said to make the 160-acre limitation specifically applicable here is section 2 of the Warren Act of 1911, 36 U.S. Stat. 926, 43 U.S.C. § 524, which authorizes the Secretary of the Interior, in carry-

It is asserted that the state, in connection with the project, will not only use facilities paid for in whole or in part by the federal government but will also take advantage of water developed and conserved by the federal Central Valley Project and that therefore the 160-acre limitation is applicable. At the outset it must be noted that the United States has not appeared in this action or in any manner objected to omission of the 160-acre limitation from the contract. If the federal officials responsible for administering the reclamation law had considered the contract to be inconsistent with that law, their position could have been made known in these proceedings either by intervention for the purpose of sustaining the federal policy (*County of San Bernardino* v. *Harsh California Corp.*, 52 Cal.2d 341, 345 [340 P.2d 617]) or by appearance as amicus curiae (cf. *Ivanhoe Irr. Dist.* v. *All Parties*, 47 Cal.2d 597, 607 [306 P.2d 824]).

With respect to use by the state of federal facilities, particular stress is placed on the San Luis Project, which will be jointly used and paid for by the state and federal governments. The applicability of the 160-acre limitation to state water which passes through the San Luis facilities was thoroughly considered in connection with the adoption of the federal San Luis Unit Act of 1960, 74 U.S. Stat. 156, and the drafting and signing, pursuant to the act, of an agreement between the United States and the Department of Water Resources of the State of California "for the construction and operation of the joint-use facilities of the San Luis Unit." That agreement, executed on December 30, 1961, makes no provision for application of the 160-acre

ing out the provisions of the reclamation law, to cooperate with irrigation districts, water-users' associations, corporations, entrymen, or water users for the construction or use of such reservoirs, canals or ditches as may be advantageously used by the government and the irrigation districts, etc. for irrigation purposes, provided: "That water shall not be furnished from any such reservoir or delivered through any such canal or ditch to any one landowner in excess of an amount sufficient to irrigate one hundred and sixty acres."

Section 46 of the Omnibus Adjustment Act of 1926, 44 U.S. Stat. 649, now 70 U.S. Stat. 524 (1956), 43 U.S.C. § 423e, requires that before water is delivered from a new project a contract for the repayment of the cost of the United States be signed by an irrigation district organized under state law and that such contract provide in substance that no irrigable land owned by one private owner in excess of 160 acres shall receive water from such project unless the owner has executed contracts for the sale of the excess land at prices not to exceed those fixed by the Secretary of the Interior on the basis of its value, without reference to increase of value because of the construction of the irrigation project.

limitation to areas serviced by the state, and the legislative and administrative history of the subject shows that the use by the state of the San Luis facilities does not require the imposition of the federal restrictions.

The San Luis act (74 U.S. Stat. 156) authorized the Secretary of the Interior to construct, operate, and maintain certain facilities of the San Luis unit for joint use of the United States and the state to the capacity necessary to serve both the federal and state service areas, and it provided that in so doing the Secretary was to be governed by the federal reclamation laws. (§ 1 of the San Luis act.) He was authorized to enter into an agreement for coordinated operation of the unit which would enable the state to deliver water outside the federal service area without cost to the United States. No funds for the commencement of construction under such agreement were to be appropriated prior to 90 days after the agreement had been submitted to Congress and then only if within the 90 days neither the House nor the Senate Interior and Insular Affairs Committee had disapproved it. (§ 2 of the San Luis act.) The agreement was to provide that the state pay in annual installments an equitable share of the construction cost of the joint-use facilities. (§ 3, subd. (b), of the San Luis act.)

The bill as originally introduced made no specific reference to applicability of federal reclamation laws to water for which the state would use the San Luis facilities. (105 Cong. Rec. 7484.) In both the Senate and House Interior Committees language was added to the effect that "the provisions of the Federal reclamation laws shall not be applicable to water deliveries . . . serving lands under contract with the State to receive the water supply, outside of the Federal San Luis unit service area. . . ." (§ 6(a) of S. 44, § 7 of H.R. 7155, 86th Cong., 1st Sess. (1959).) However, this provision was eliminated in both the House and Senate versions. Members of Congress expressed different views as to the meaning of this provision and the reasons why they thought it should be eliminated: 1. The provision was surplusage since, even without it, the acreage limitation would not apply to the state service area. 2. The courts, without direction by the provision, should decide to what extent federal reclamation laws apply to the various phases of the project. 3. The federal restrictions should not apply to the state service area but the inclusion of the provision in the act might tend to undermine the federal acreage limita-

tion in general. 4. The federal acreage limitation should apply to the state service area. (See, e.g., 105 Cong. Rec. 7496, 7994; *id.* 7989, 7683; *id.* 7873; 106 Cong. Rec. 10467.)

The legislative intent to be derived from the elimination of this provision was thus not made clear, and the Secretary, before signing the agreement with the state, asked legal advice from the Solicitor of the Department of the Interior and from the Attorney General. Both concluded that federal law did not require that the acreage restrictions be imposed on the state service area of the San Luis unit.

The Solicitor of the Department of the Interior reasoned as follows: In section 1 of the act, which provides that the Secretary was to be governed by the federal reclamation laws in constructing, operating, and maintaining "the San Luis unit," the term "San Luis unit," as shown by its use in other parts of the section, meant the federal service area only. The concern of the advocates of the federal limitation was that the benefits of federal expenditure should not be conferred on owners of excess land, but there is no basis for such concern in regard to the state service area because the act provides that water for that area is to be supplied "without costs to the United States" and contains detailed provisions for payment by the state of its equitable share of all costs. A memorandum of the United States Commissioner of Reclamation shows that the state will not use federal Central Valley Project facilities other than the joint-use facilities of the San Luis unit. Federal reclamation laws would not apply to a state project merely because state water and water from federal projects had been commingled. Since the San Luis unit project presented a unique joint venture of two sovereigns each of which paid its share and was not subsidized by the other, the imposition of the federal limitation in the state service area was not necessary to carry out national policy and would clash with the basic policy of leaving the states free where federal interests are not impaired. (See M-36635 (Dec. 26, 1961) 68 Decisions Dept. Interior 412.)

The Attorney General, in a letter dated December 29, 1961 (108 Cong. Rec. 5262 (Apr. 2, 1962) 87th Cong., 2d Sess.), concurred in the conclusion of the Solicitor but pointed out that the legislative history was not conclusive and that it was fortunate that under the provisions of the San Luis act, Congress itself would have an opportunity to determine

whether or not the acreage limitation should apply in the state service area.

The contract with the state was executed on December 30, 1961, and in accordance with section 2 of the act it was submitted to Congress together with the opinion of the Solicitor and the letter of the Attorney General. Neither the House nor the Senate Interior and Insular Affairs Committee disapproved the agreement, and on October 13, 1962, a bill was passed which appropriated $47,401,000 for the Central Valley Project, of which $27,010,000 (including approximately $14,000,000 advanced by the State of California) was allocated for the San Luis unit. (108 Cong. Rec. 22190, daily ed., Oct. 13, 1962; Hearings Before a Subcommittee of the Committee on Appropriations of the House of Representatives, 87th Cong., 2d Sess., p. 226 (1962).) We may conclude from these facts that Congress approved the view that the acreage limitation should not apply in the state service area of the San Luis unit.

It is also contended that the 160-acre limitation is applicable because the federal government contributes part of the cost of construction of the Oroville Dam. The contribution does not have this effect. The Oroville Dam is a state facility, and the federal government's contribution is not based on reclamation legislation but is authorized by the Flood Control Act of 1958, which limits the federal contribution to "flood control" benefits from the dam without any indication that the 160-acre limitation provided for in the reclamation law is to apply. (72 U.S. Stat. 305, 315-316, § 204.)

In connection with the contention that the state will use water developed and conserved by the federal Central Valley Project, it is pointed out that water from that source will be commingled in reservoirs and canals with water belonging to the state and that both the federal government and the state will make use of the commingled water for their respective projects. As stated by the Solicitor, federal reclamation laws are not applicable merely because state water has been commingled with water from federal projects. (Opn. M-36635, Solicitor Dept. Interior (December 26, 1961) *supra*, 68 Decisions Dept. Interior 412, 421; see also Opn. M-36011, Solicitor Dept. Interior (September 23, 1949), Engle Central Valley Project Documents, part 2, 85th Cong., 1st Sess., H.R. Doc. No. 246, pp. 698-702.) The federal acreage limitation may be applicable if the state

takes more water out of the combined supply than is of state origin, but there is a sound basis for concluding that the state here will not use more water than it contributes. On May 16, 1960, an agreement was concluded between the department and the United States to coordinate the operation of the federal Central Valley Project and the state Feather River and Delta diversion projects, paragraph 12 of which contains an apportionment of the annual water diversions to which the United States and the state will be entitled. That agreement did not provide for the application of the 160-acre limitation. The water made available to the state in the contract was considered to come only from state sources, i.e., the yield at Oroville Reservoir and surplus water in the Delta.[15] (Letter of U.S. Comr. of Reclamation appended to Opn. M-36635, Solicitor Dept. Interior, *supra,* 68 Decisions Dept. Interior 427.) Since it does not appear that any federal water was apportioned to the state, the contention must be rejected.

H. *Is the contract invalid on the theory that the option for continued service provided for in article 4 leaves essential terms to the future agreement of the parties?*

Under the option contained in article 4 the district at the end of the contract term and after each succeeding period, may elect to receive continued service on certain specified conditions, which include service of water up to the district's maximum entitlement under the present contract and at no greater cost to the district than would have been the case if the contract had continued in effect. The option further states that other terms shall be reasonable and equitable and shall be mutually agreed upon.[16] It is asserted that the

---

[15]At certain times of the year there are large quantities of surplus water in the Delta, which, when not diverted or stored, flow uselessly into Suisun Bay. At other times shortages occur, and water from the Feather River Project as well as from the federal Trinity Project will be used to provide additional water during such shortage periods. (Dept. of Public Works, Div. of Water Resources, Program for Financing and Constructing the Feather River Project (Feb. 1955) pp. 18-20, 93-100; The California Water Plan, Dept. Water Resources Bull. No. 3 (May 1957) p. 1.)

[16]Article 4 reads: ''4. *Option for Continued Service.* By written notice to the State at least six (6) months prior to the expiration of the term of this contract, the District may elect to receive continued service after expiration of said term under the following conditions unless otherwise agreed to: (1) Service of water in annual amounts up to and including the District's maximum annual entitlement hereunder. (2) Service of water at no greater cost to the District than would have been the case had this contract continued in effect. (3) Service of water under the same physical conditions of service, including time, place, amount and

absence from the option of provisions fixing the time and method of payment for water to be delivered during the continued service leaves essential matters to the future agreement of the parties and renders the option void.

Although a promise gives rise to no legal obligation if an essential term is reserved for future agreement, the enforceability of a contract containing a promise to agree depends upon the relative importance and the severability of the matter left to the future. The question is one of degree and may be settled by determining whether the indefinite promise is so essential to the bargain that inability to enforce that promise strictly according to its terms would make unfair the enforcement of the remainder of the agreement, and, where the matters left for future agreement are not essential, each party may be required to accept a reasonable determination of the unsettled point or, if possible, the unsettled point may be left unperformed and the remainder of the contract enforced. (*City of Los Angeles* v. *Superior Court*, 51 Cal.2d 423, 433 [333 P.2d 745].)

The language of the option involved here contains the essential conditions, one of which is "service of water at no greater cost to the District." The term "at no greater cost" need not be restricted to the amount of the charges to be paid but may be construed as also meaning under no more onerous terms and conditions of payment than are now in the contract. Detailed terms and conditions of payment for the continued service are not essential to the validity of the option and may be determined by the parties or by a court. The circumstance that both parties are public bodies concerned with the continuation of an extensive water service in the public interest warrants the assumption that they will be able to find a reasonable and equitable solution, and in the unlikely event that the parties cannot agree, the court may determine the payment conditions.

I. *In view of the option for continued service, does*

rate of delivery, as are provided for hereunder. (4) Retention of the same chemical quality objective provision as is set forth herein. (5) Retention of the same options to utilize the project transportation facilities as are provided for in Articles 18(b) and 18(c), to the extent such options are then applicable. Other terms and conditions of the continued service shall be reasonable and equitable and shall be mutually agreed upon. In the event that said terms and conditions provide for continued service for a limited number of years only, the District shall have the same option to receive continued service here provided for upon the expiration of that and each succeeding period of continued service."

*the contract fail to meet the requirement of section 12937 that it be for a stated term?*

It is asserted that because article 4 permits options in perpetuity it violates section 12937, which provides in part: "Said contracts [for sale of water and power] shall be for a stated term and, insofar as practicable and feasible, for the full term of the life of the general obligation bonds issued under this chapter and each such contract shall recite (i) that it is entered into for the direct benefit of the holders and owners of all general obligation bonds issued under this chapter, and (ii) that the income and revenues derived from such contracts are pledged to the purposes and in the priority herein set forth."

 In the absence of a statutory prohibition there is no valid objection to contracts for perpetual water service. (*Sawyer* v. *City of San Diego,* 138 Cal.App.2d 652, 660 [292 P.2d 233].) It is clear from the context of section 12937 that it was intended to protect the bondholders by requiring a stability which would be lacking if the contract were terminable at will. In accordance with this purpose article 2 provides that the contract "shall remain in effect throughout the entire project payment period, or for seventy-five (75) years from the effective date of the contract, whichever period is longer." The option provision does not detract from the effectiveness of the protection provided by section 12937 and does not violate that provision when the section is reasonably construed according to its purpose.

 J. *Are the payment provisions of the contract so uncertain, inadequate, and defective as to be unenforceable?*

As we have seen, the contract provides for repayment of the costs of the entire project by means of the charges to be paid by the contractors. It contains an elaborate system for the determination of the share that each contractor shall contribute, and as part of this determination certain cost allocations must be made. It is contended that some of these allocations, provided for in article 22(e), require the evaluation of imponderables on a subjective basis (i.e., involving personal opinion and discretion) and that the contract does not provide who shall make the subjective evaluations.

Article 22(f) provides in part: "The rates to be used in determining the components of the Delta Water Charge pursuant to subdivision (d) of this article and to become effective on January 1, 1970, shall be computed by the State in ac-

cordance with subdivision (c) of this article prior to that date.'' It is contended that subdivision (f) authorizes the state to make only the calculations provided for in the subdivisions mentioned, namely, (c) and (d), which do not involve opinion or discretion, but that subdivision (f) does not authorize the state to make the allocations contained in subdivision (e). However, the allocations referred to in subdivision (e) are necessary factors in the computation of rates which, under subdivision (f), will be made by the state. Several other provisions of the contract leave to the state determinations with respect to the water charges which involve subjective opinion and discretion,[17] and no provision of the contract leaves any comparable determination to others than the state. The contract considered as a whole leaves no doubt that the allocations must be made by the state.

It was not improper to leave the making of the subjective allocations to the discretion of the state. A contract may provide that conclusive factual determinations may be made by the government or its officers, and such determinations will be enforced in the absence of bad faith. (*United States* v. *Wunderlich*, 342 U.S. 98, 100 [72 S.Ct. 154, 96 L. Ed. 113] ; *United States* v. *Moorman*, 338 U.S. 457, 461-462, [76 S.Ct. 288, 94 L.Ed. 256].) In this connection it should be pointed out that article 38 provides that when a determination is to be made by either party to the contract, the determination shall not be ''arbitrary, capricious, or unreasonable.''

 It is further contended that the contract is defective in that the method set forth in article 24(b) for the calculation of part of the charges to be paid by the district cannot be applied because the district will receive its ''maximum annual entitlement'' through more than one aqueduct branch or reach without provision as to how much is to be received through a particular branch or reach.[18] A provision which

_____

[17]See, e.g., articles 22 and 23 which contain provisions showing that the state shall determine which costs of project facilities are reimbursable by the contractors, and articles 24(b)(3) and 25(b) which provide that the state shall make the allocation of the ''transportation charge'' among the contractors.

[18]Article 24(b) provides that the total capital costs of each aqueduct reach shall be allocated among all contractors entitled to delivery of project water from or through the reach according to the proportionate use of each and describes one of the ratios used in determining the proportionate use as ''the ratio of the contractor's maximum annual entitlement to be delivered from or through the reach to the total of the maximum annual entitlements of all contractors to be delivered from

would solve the problem is not essential to the validity of the contract, and the solution may properly be left to future agreement of the parties. (Cf. *City of Los Angeles* v. *Superior Court, supra,* 51 Cal.2d 423, 433.)

K. *Does article 16(d) of the contract impose restrictions on the use of bond proceeds inconsistent with the uses provided for by section 12938?*

Section 12938 gives the department discretion to decide which "additional facilities" shall be constructed.[19] Article 16(d) restricts the facilities to be constructed under that section primarily to "additional project conservation facilities" and "related, appurtenant facilities necessary and desirable to meet local needs."[20] The department has broad power to make contracts concerning project water, and there is no reason why it could not properly exercise the discretion given it in section 12938 by incorporating its decision into a contract.

L. *Does article 17(d) impose restrictions on the issuance of bonds inconsistent with the power given by sec-*

or through the reach." The contract states the district's total maximum annual entitlement as one single amount (art. 7(b)) and does not provide a method for determining the maximum annual entitlement applicable to each separate reach through which the district will receive water.

[19]Section 12938 provides in part that, to the extent money from the California Water Fund is used for the construction of the State Water Facilities, bond proceeds in an equal amount "shall be expended for the construction of such additional facilities of the State Water Resources Development System as the department shall determine to be necessary and desirable to meet local needs, including, but not restricted to, flood control, and to augment the supplies of water in the Sacramento-San Joaquin Delta. . . ."

[20]Article 16(d) of the contract provides: "Bond funds required to be expended for the construction of additional facilities of the System under the provisions of Section 12938 of the Water Code shall be expended only for construction of additional project conservation facilities as defined herein, and related, appurtenant facilities necessary and desirable to meet local needs: Provided, That if at any time after 1985 the State finds that a part or all of such bond funds are not then required for the above purpose, and will not be so required within the next succeeding ten (10) years, such bond funds may be used, to the extent permitted in the Bond Act, to construct supplemental conservation facilities as defined herein."

As used in the contract, "additional project conservation facilities" means those facilities provided for in section 12938 intended to prevent any reduction in the "minimum project yield" (art. 1(h)), and the latter term means the dependable annual supply of project water to be made available, estimated at 4,000,000 acre-feet per year (art. 1(m)). "Supplemental conservation facilities" means those facilities intended to supply water in addition to the minimum project yield and for local uses (art. 1(p)).

*tion 12939 to the California Water Resources Development Finance Committee?*[21]

Article 17(d) provides that no bonds shall be sold, nor funds made available by the bond act expended, for an aqueduct or a conservation facility until certain steps are taken to insure recovery to the state of at least 75 per cent of the capital costs of the aqueduct or facility. Under section 12939, in order for bonds to be issued, the finance committee shall determine whether or not their issuance is necessary or desirable, but this power is to be exercised only "upon the written request" of the department. Under section 11560 the department is to construct the project when in its judgment sufficient funds will become available "from all sources" to meet costs and expenses, including the payment of bonds, and, accordingly, it has power to determine whether the financial conditions for construction are fulfilled and whether the question of desirability of the issuance of bonds shall be submitted to the finance committee. These sections, considered together, thus show that bonds cannot be issued until both the department and the finance committee have determined that they should be. The department, in exercising its powers, could properly insist upon the restrictions expressed in article 17(d), and, as shown by our discussion of the preceding topic, there is no objection to the inclusion of such a determination in the contract.

▆▆▆ M. *Does the provision of article 17(f)(1) for giving the district credit for funds which in certain circumstances it may provide to the state conflict with section 11139?*[22]

Section 11139 prohibits repayment of advances made by a

---

[21]The California Water Resources Development Finance Committee, created by section 12933, consists of the Governor, the State Treasurer, the State Controller, the Director of Finance, and the Director of Water Resources.

[22]Article 17(f)(1) provides that if the state fails or is unable to complete transportation facilities intended to serve the district, the district has the option of providing funds to the state for the completion, and, if it does so, the amount provided by it "shall be credited by the State against the District's payment obligation under the capital cost component of the Transportation Charge, but the District shall be and remain obligated to pay its share of any capital costs of the above-described facilities not paid for with such funds, . . ."

Section 11139 reads: "The department may enter into an agreement with any state agency to repay any money or the value of any rights of way, labor, materials, or other property advanced or contributed; but no repayment therefor shall be made until all obligations issued by the department for the construction of the project have been fully redeemed and paid, and then only out of the revenues received from the operation of the project."

state agency until all obligations "issued by the department" for the construction of the project have been fully redeemed. That section is one of the provisions governing the Central · Valley Project, and, although these provisions as a group have been made applicable by section 12931 to the system involved here, a specific provision designed to govern the Central Valley Project obviously can apply only to the extent that its terms are pertinent to the special circumstances presented by the new system. Section 11139 relates only to redemption of obligations "issued by the department." This clearly refers to Central Valley Project Revenue Bonds, which the department is authorized to issue in its own name and which are not obligations of the state (§§ 11700, 11705, 11721), and has no application to the general obligation bonds of the state to be issued under the bond act (§ 12936).

 N. *Is article 20, which provides that in the event of default, by the district the state may upon not less than six months' notice suspend deliveries of water, contrary to section 11627?*

Section 11627 states that every water contract made by the department "shall provide that, in the event of any default in the payment of any money specified in the contract to be paid to the department, the department may, upon such notice as it determines, cease to furnish or deliver water, use of water, water storage, electric power, or other service under the contract." The six-month notice provided for in article 20 was properly included in the contract by the department under the power given to it by section 11627 to determine what notice should be given; the section does not require that such a determination be made each time a default occurs.

It is not true that the contract fails to provide for termination of services which, under the statute, should terminate on default. The provision in article 20 that the state may "suspend deliveries of water under this contract" is clearly broad enough to permit the state to cease transportation not only of project water but of nonproject water as well.[23] It is also broad enough to permit the state to cease retaining stored water for emergency requirements of the district (art. 17(b)), since it may be assumed that the parties intended that if the duty to make emergency deliveries were

---

[23]Article 18(c)(2) provides that under certain circumstances the state will permit the district to use state transportation facilities for the delivery of nonproject water.

to end, the incidental duty to store for that purpose would also end.

▮▮▮▮ O. *Does article 34(a) of the contract, which requires the district to levy any tax necessary to provide means for the payments under the contract, contravene the limitation on taxation set forth in section 5, subdivision 8, of the Metropolitan Water District Act?*[24]

The contractual provision is based on section 11652, which reads: "The governing body shall, whenever necessary, levy upon all property in the State agency not exempt from taxation, a tax or assessment sufficient to provide for all payments under the contract then due or to become due within the then current fiscal year." Section 11652 is a special provision relating only to taxation to meet obligations from water contracts with state agencies, whereas section 5, subdivision 8, of the Metropolitan Water District Act is a general provision relating to taxation by a district for all purposes not specifically excepted. The special provision controls over the general provision and has the effect of adding another exception to it.

▮▮▮▮ P. *Did the district, by entering into the contract, incur indebtedness in excess of that allowed by section 5, subdivision 7, of the Metropolitan Water District Act?*

That statute provides that no district incorporated under the Metropolitan Act shall incur "indebtedness" in excess of 15 per cent of the assessed valuation of all the taxable property within the district. (Stats. 1927, ch. 429, p. 694, as amended.) There is no contention that the amount of charges which at any one time will be due and unpaid under the contract will exceed the statutory limit. That limit could be exceeded only if the district's "indebtedness" were viewed as being the aggregate amount of all payments to be made throughout the entire term of the contract. Such a view would be unsound.

---

[24]Article 34(a) provides: "If in any year the District fails or is unable to raise sufficient funds by other means, the governing body of the District shall levy upon all property in the District not exempt from taxation, a tax or assessment sufficient to provide for all payments under this contract then due or to become due within that year."

Section 5, subdivision 8, of the Metropolitan Water District Act (Stats. 1927, ch. 429, p. 694, as amended) provides that taxes levied by a district incorporated under that act, except taxes levied to meet the bonded indebtedness of the district or any obligation of the district to the United States or any agency thereof, shall not exceed five cents on each one hundred dollars of assessed valuation of taxable property included in the district.

A helpful, distinction is made in cases involving the analogous provision in section 18 of article XI of the Constitution, which imposes limits upon any "indebtedness or liability" incurred by municipal corporations. On the one hand, it has been held that where a contract provides that services, materials, etc. will be furnished to a municipal corporation in the future and payment is made contingent on the furnisher's performance, no indebtedness is incurred until the furnishing of the service, materials, etc. takes place.[25] On the other hand, with respect to transactions in which the consideration is received by the municipal corporation at the outset but payment by the municipal corporation is extended over a number of years, it is held that the total indebtedness is incurred at the outset.[26]

Although the contract, insofar as it provides for the contractors to return to the state all costs of the project, has a slight resemblance to an agreement for the purchase of an interest in a water system on the installment plan, it has a much greater resemblance to a contract for the furnishing of continued water service in the future. All payments to be made by the district are contingent on future performance of contractual duties by the state. (Art. 29.) The district does not obtain ownership of any facilities, ownership by the state being expressly provided for. (Art. 17

[25]Some of the cases which hold that an indebtedness arose only when each separate payment became due are: *City of Oakland* v. *Williams*, 15 Cal.2d 542, 551 [103 P.2d 168] [contract among cities to procure a survey of common sewage problems to be paid for by the city in installments, depending on ultimate costs of survey]; *Higgins* v. *San Diego Water Co.*, 118 Cal. 524, 553-554 [45 P. 824, 50 P. 670] (overruled on a nonpertinent point in *Miller* v. *McKinnon*, 20 Cal.2d 83, 90 [124 P.2d 34, 140 A.L.R. 570]) [20-year lease of a water plant to city with covenant for continuous supply of water during the period]; *Smilie* v. *Fresno County*, 112 Cal. 311, 313 [44 P. 556] [contract for building of additions to county courthouse to be paid in installments according to progress]; *McBean* v. *City of Fresno*, 112 Cal. 159, 164-168 [44 P. 358, 53 Am.St.Rep. 191, 31 L.R.A. 794] [5-year contract to dispose of city sewage at annual rate, the contractor to build a plant for that purpose]; cf. *City of Walla Walla* v. *Walla Walla Water Co.*, 172 U.S. 1, 19-21 [19 S.Ct. 77, 43 L.Ed. 341] [25-year water service contract].

[26]Cases holding that the total indebtedness was incurred at the outset are: *Mahoney* v. *City & County of San Francisco*, 201 Cal. 248, 258 et seq. [257 P. 49] [acquisition of land in the form of lease as part of plan to acquire ownership of land for recreation purposes]; *In re City & County of San Francisco*, 195 Cal. 426, 434 et seq. [233 P. 965] [purported lease held to be a conditional sale on installment plan]; and *Chester* v. *Carmichael*, 187 Cal. 287, 291 et seq. [201 P. 925] [acceptance by city of deed to land, the city to spend $5,000 annually to a total of $50,000 to improve the land for park purposes].

(f)(1), 17(f)(2).) Nothing in the contract indicates that the state shall hold title as a trustee or that the district shall be an equitable owner. To consider this contract as a purchase on the installment plan and all future payments under it as a single indebtedness incurred at the outset would be unrealistic.

■■■■ Q. *Is the contract invalid because it was executed four days before the voters approved the bond act?*

The contract is not objectionable on this ground. In recognition of the possibility that the voters might not accept the bond act, the contract provided that it would be of no further force or effect in the event the act was rejected. (Art. 2.) The making of the contract was well publicized prior to the date of the election, and, as we have seen, after the approval of the act by the voters, the contract was reviewed at length by the Legislature and that body made no objection to it. Moreover, after the bond act had become fully effective, a memorandum was signed by the parties to the contract for the purpose of ratifying or reexecuting it, with certain amendments as to minor points.

Other objections made are completely lacking in merit and need not be discussed.

Let a peremptory writ of mandate issue.

Traynor, J., Schauer, J., McComb, J., Peters, J., Tobriner, J., and White, J.,* concurred.

---

*Retired Justice of the Supreme Court sitting pro tempore under assignment by the Chairman of the Judicial Council.